No. 73,994

Universal Motor Fuels, Inc., *Appellant*, v. Michael L. Johnston, Secretary of the Department of Transportation of the State of Kansas, *Appellee.*

(917 P.2d 877)

Opinion filed May 31, 1996.

*Phillip Mellor* of Mellor & Miller, of Wichita, argued the cause, and *Arden P. Miller* and *Mark Mellor*, of the same firm, were with him on the briefs for appellant.

*John W. Strahan*, first assistant attorney, of Kansas Department of Transportation, argued the cause, and *Michael B. Rees*, chief counsel, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: The issue in this case is whether the plaintiff land-owner, Universal Motor Fuels, Inc., has a cause of action for breach of contract against the Kansas Department of Transportation (KDOT) or is limited to a claim for inverse condemnation. The trial court held the landowner has no cause of action for breach of contract. The landowner dismissed the claim for inverse condemnation (without prejudice) and appealed.

The landowner owns real estate in Goddard, Kansas, which abuts U.S. Highway 54, a controlled access highway. In 1962, Haynes Pruitt, Eileen Pruitt, Andrew Pruitt, Doris Pruitt, and Universal Service Station, Inc. (the landowner's predecessors) entered into a contract with the State Highway Commission (now known as KDOT) in which the Pruitts and Universal Service Station, Inc. sold a portion of their highway access rights to KDOT, but reserving certain rights. The deed (which the contract merged into) stated in pertinent part:

"[T]he parties of the first part [plaintiff's predecessors], in consideration of the sum of One Hundred Dollars to Them in hand paid by party of the second part [KDOT], receipt whereof is hereby acknowledged by these presents, do grant, bargain, sell and convey unto the party of the second part forever all their right, title and interest in and to the following described real estate lying and situate in the County of Sedgwick and State of Kansas, to wit:

" 'FOR CONTROLLED ACCESS HIGHWAY PURPOSES' the land in Lot 1, Block C Pruitt's Addition to Goddard, shall have no right or easement of access to the highway over and across the North line of Lot 1, Block C; *Except and reserving however, unto owners of abutting land, their successors or assigns, the right of access to said highway for the purpose of entrances over and across the following described courses*: BEGINNING at a point on the North line of said Lot 1, Block C, 49.0 feet East of the Northwest Corner thereof; thence East along said North line 45.0 feet; also beginning at a point on said North line, 169.0 feet East of said Northwest Corner; thence East along said North line 45.0 feet; Also beginning at the Northeast Corner of said Lot 1, Block C and extending West along said North line, 40.0 feet." (Emphasis added.)

The landowner asserts that in this 1962 deed, its predecessors promised to give KDOT all of their access rights to U.S. 54 except for the three reserved areas. In return, the landowner contends that KDOT promised to give the landowner's predecessors $100

and assured the landowner's predecessors that they or their successors and assigns could keep the reserved access rights forever without the rights ever being restricted by KDOT.

Universal Service Station, Inc., built a service station/convenience store on the property. To provide access to the service station, Universal Service Station, Inc., used two of the three portions of access rights reserved in the contract and built two highway entrances.

In the summer of 1993, KDOT repaved U.S. Highway 54. In so doing, KDOT closed both of the highway entrances from the service station to U.S. 54. Upon completion of the repavement, KDOT widened, improved, and reopened one of the entrances to the service station. However, KDOT did not reopen the second entrance. The second entrance was permanently curbed for safety reasons. The third reserved area, which did not have a highway entrance built on it, was also restricted.

In December, 1993, the landowner filed a petition in Sedgwick County District Court alleging inverse condemnation because the State had taken its property without compensation. Later, the landowner amended its petition by also alleging breach of contract. The landowner contends that the closure of this entrance constituted a breach of contract by KDOT because KDOT violated its contractual promise that the landowner, as an assign or successor of the Pruitts and Universal Service Station, Inc., could keep the reserved access rights forever without restriction. KDOT contends it did not make a contractual promise that the landowner could keep the reserved access rights forever. Further, KDOT contends that even if it did make this contractual promise and breached the contract, it was justified in closing the entrance based upon the police power of the State. Finally, KDOT contends that the landowner is really bringing a disguised inverse condemnation action that should fail because of the State's police power. Based on these arguments, KDOT filed a motion to strike the landowner's breach of contract claim.

The trial court found that the landowner did not have a right to recover for breach of contract and dismissed the contract claim. The court reasoned it should not recognize a breach of contract

claim under the facts because the State often acquires highway access rights by contract. Thus, if the court found that the landowner could bring this action under a breach of contract theory, then all landowners who sold a right-of-way to the State by contract could also bring a breach of contract claim. The court found this to be unacceptable because allowing breach of contract actions would expand the case law on inverse condemnation cases. For instance, in a typical inverse condemnation case, the court decides, not the jury, if a compensable taking has occurred. Whereas, in a breach of contract action, the jury would be able to determine whether a contract had been breached. Of more importance, in a breach of contract action, the landowner could recover lost business profits which are clearly excluded as damages under traditional inverse condemnation cases. Thus, the court dismissed the breach of contract action, finding that the landowner's cause of action is for inverse condemnation in which the court must determine whether this was a compensable taking or noncompensable as the exercise of police power.

The landowner dismissed its inverse condemnation claim without prejudice and appealed the trial court's dismissal of the contract claim to the Court of Appeals. The appeal was transferred to this court.

## DID KDOT BREACH A CONTRACT?

The only way KDOT could have breached a contract when it restricted the landowner's reserved right of access is if KDOT had promised in the 1962 deed that it would never restrict the reserved rights of access. Thus, the issue is whether in the deed KDOT promised that it would preserve the landowner's reserved rights of access as free from restrictions forever. "[An appellate] court can review the negotiated agreement and decide its legal effect. Regardless of the construction the district court gave the agreement, [an appellate] court may independently construe the contract and determine its legal significance. [Citation omitted.]" *NEA-Goodland v. U.S.D. No. 352*, 13 Kan. App. 2d 558, 562, 775 P.2d 675, *rev. denied* 245 Kan. 785 (1989). When interpreting contracts, the court must look to the intent of the parties. *Palmer v. The Land &*

*Power Co.*, 180 Kan. 492, 306 P.2d 152 (1957); *Catholic Diocese of Dodge City v. Raymer*, 16 Kan. App. 2d 488, 825 P.2d 1144, *aff'd* 251 Kan. 689, 840 P.2d 456 (1992).

According to the landowner, the reservation of access rights in the contract constituted a promise or assurance by KDOT which it gave to the landowner's predecessors, their successors, and their assigns that the landowner would continue to enjoy access to the highway at those specific points forever. The landowner concedes that the contract was for the sale of the landowner's predecessors access rights to KDOT. However, the landowner contends that KDOT intended to give the landowner's predecessors something in return for these access rights—$100 and an assurance that the reserved access rights would never be disturbed. The landowner argues that if KDOT did not intend to make this promise, then the contract would have simply described the specific areas which the landowner's predecessors were selling to KDOT. Instead, the contract specifically stated that the landowner's predecessors reserved access rights which accrued to the grantors, their successors and assigns. According to the landowner, the deed expressed a covenant that KDOT would never restrict the reserved access rights which ran with the access rights to successive owners.

KDOT contends that the parties did not agree in the contract that the landowner's predecessors, their successors, and their assigns could keep the reserved access rights forever or that the rights would always be free from restrictions. The clause at issue is: "Except and reserving however, unto owners of abutting land, their successors or assigns, the right of access to said highway for the purpose of entrances over and across the following described courses . . . [land description]." Citing Black's Law Dictionary, KDOT asserts that the word "reserving" as used in the contract is used to describe property rights which are retained or set aside for a particular purpose or person. According to KDOT, the "reserved" access rights as guaranteed in this contract mean that the access rights will remain with the landowners but not that the rights are protected forever against a restriction by KDOT's police power. KDOT contends that the contract does not contain any language which guarantees that it would never need to redo the highway

and restrict the landowner's access rights for safety reasons. In fact, KDOT contends that it does not even have the power to contract away its police power if it wanted to. According to KDOT, the contract should not be interpreted as the landowner contends because this was not the parties' intent.

"[R]estrictive covenants in deeds are to be construed in accordance with the intent and purpose of the grantors after examination of the entire instrument under consideration." *South Shore Homes Ass'n v. Holland Holiday's*, 219 Kan. 744, 751, 549 P.2d 1035 (1976) (citing *Sporn v. Overholt*, 175 Kan. 197, 262 P.2d 828 [1953]). This court has held that "where ambiguity or uncertainty of contract is involved in an agreement, the intention of the parties is not ascertained by resort to literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties." *Richardson v. Northwest Central Pipeline Co.*, 241 Kan. 752, 758, 740 P.2d 1083 (1987).

We hold the "reserving" and "excepting" language along with the description of the land simply indicates that the landowner's predecessors conveyed most of their highway access rights to KDOT, but reserved three specific access points as easements appurtenant. " ' "An easement appurtenant inheres in the land, concerns the premises, and is necessary to the enjoyment thereof. It is incapable of existence separate and apart from the particular messuage or land to which it is annexed, there being nothing for it to act on." ' " *Allingham v. Nelson*, 6 Kan. App. 2d 294, 296, 627 P.2d 1179 (1981) (quoting *Smith v. Harris*, 181 Kan. 237, 247, 311 P.2d 325 [1957]). The easements at issue concerned the dominant estate (the land which the service station was on), allowing the landowners and their customers to have access to the highway from the service station. Thus, the contract reserved and excepted three easements appurtenant.

The landowner contends that the landowner's predecessors did not merely reserve easements in the contract. Instead, the landowner implies that the "successors and assigns" language of the contract indicated a promise by KDOT that it would never restrict

the easements but instead would preserve the easements forever so the landowners' successors and assigns could use them. In other words, the landowner believes the deed contained a restrictive covenant running with the land, promising that KDOT would never restrict the easements reserved in the contract. See *Beall v. Hardie*, 177 Kan. 353, 356, 279 P.2d 276 (1955) (defining a covenant as a contractual promise.) We disagree with the landowner's interpretation of the contract.

An easement appurtenant " ' "attaches to the land to which it is appurtenant, and *passes to the heirs or assigns* of the owner of the land, such as by a conveyance or devise of the dominant estate." ' " 6 Kan. App. 2d at 296 (citing 181 Kan. at 247). (Emphasis added.) The "successors or assigns" language in the contract simply refers to the legal rule that easements appurtenant pass to the assigns of the original owner. The language was used in the contract to make it perfectly clear that the access rights reserved in the contract were easements appurtenant which passed to the landowners' successors and were not easements in gross or any other type of property. This "successor and assigns" language was not meant to be a promise by KDOT that the landowners or their assigns would own the easements forever without any restrictions imposed by KDOT's police power. On the contrary, easements appurtenant, even though they pass to the assigns of the original owner, are not protected from restriction by KDOT's police power. See *Smith v. State Highway Commission*, 185 Kan. 445, 453, 346 P.2d 259 (1959) ("The police power is the power of government to act in furtherance of the public good, either through legislation or by the exercise of any other legitimate means, in the promotion of the public health, safety, morals and general welfare, without incurring liability for the resulting injury to private individuals.") Based upon the facts of this case, the easements at issue should not be treated any differently just because they were reserved in a contract in which KDOT, as the landowner of the servient estate, agreed to the easement.

Thus, the three easements appurtenant reserved in the 1962 deed passed to Universal Motor Fuels, Inc., as an assign or successor of the Pruitts and Universal Service Station, Inc., and would

have continued to pass to the assigns and successors of the dominant estate, except two of the easements were subsequently restricted by KDOT. The "successors and assigns" language in the contract does not indicate that KDOT promised to preserve the access rights for the landowner forever and never restrict them. Since KDOT did not make this promise or convey a restrictive covenant running with the land in the contract, KDOT could not have breached the contract by subsequently restricting two of the easements. The contract was completely satisfied when the landowner's predecessors gave KDOT the access rights contracted for while reserving the easements and KDOT gave the landowners $100. The restriction of one of the reserved easements had no effect on the contract.

Having held the defendant has no cause of action for breach of contract in this case, the remaining issues are moot.

The landowner's issue of whether the action of KDOT in this case is a reasonable exercise of police power is not moot. However, this issue was not decided by the trial court, as it was an issue in the inverse condemnation case which the landowner dismissed without prejudice; thus, it is not properly before this court.

Affirmed.