No. 77,999

AMOCO PRODUCTION COMPANY, *Appellee,*v. CHARLES B. WILSON, JR,. INC.; UMC PETROLEUM CORPORATION; CHARLES B. WILSON, JR.; BILLY R. POWELL; and BARBARA F. POWELL, *Appellants.*

(976 P.2d 941)

Opinion filed March 12, 1999.

*James G. Flaherty*, of Anderson, Byrd, Richeson & Flaherty, of Ottawa, argued the cause and was on the briefs for appellants Charles B. Wilson, Jr., Inc., Charles B. Wilson, Jr., Billy R. Powell, and Barbara F. Powell.

*Terry J. Barker*, of Pezold, Richey, Caruso & Barker, of Tulsa, Oklahoma, argued the cause, and *Joseph C. Woltz*, of the same firm, and *Eric L. Witcher*

and *William J. Graybill*, of Graybill & Witcher, of Elkhart, were with him on the briefs for appellant UMC Petroleum Corporation.

*Steven D. Gough*, of Kahrs, Nelson, Fanning, Hite & Kellogg L.L.P., of Wichita, argued the cause, and *Ruth B. Johnson*, of Denver, Colorado, was with him on the brief for appellee Amoco Production Company.

LARSON, J.: This is an appeal by the non-operators of an oil and gas lease, Charles B. Wilson, Jr., Inc.; Charles B. Wilson, Jr.; Billy R. Powell; and Barbara F. Powell (collectively Wilson) and UMC Petroleum Corporation (UMC), from a decision construing the terms of an operating agreement dated August 1, 1980, with Amoco Production Company (Amoco) as the operator, covering "[a]ll rights below the base of the Hugoton" in Section 35, Township 29 South, Range 40 West, Stanton County, Kansas.

The trial court granted summary judgment to Amoco, holding oil and gas leasehold interests in the north half (N/2) of Section 35, which Amoco did not possess at the time of signing the operating agreement but later acquired, were Amoco's separate property and not subject to the agreement. This decision was affirmed by the Court of Appeals. We granted Wilson's and UMC's petition for review.

Facts

On August 1, 1980, Charles B. Wilson, Jr., and Amoco entered into a joint venture to explore for and develop all oil and gas rights below the base of the Hugoton formation in Section 35, Township 29 South, Range 40 West in Stanton County, Kansas. Wilson held a valid oil and gas lease on the south half (S/2) of Section 35 and Amoco represented and purported to own an oil and gas lease on the north half (N/2) of Section 35. The interests of each party was stated to be 50%.

Amoco had obtained an oil and gas lease from the Plummer interests in 1944, covering the N/2 of Section 35. The lease contained no depth limitation, but title records showed Santa Fe Land Improvement Company in its conveyance to Warren W. Plummer had retained all mineral rights below 3,400 feet.

Amoco had obtained a title opinion in 1946 informing it of this depth limitation and knew that it had no mineral rights or oil and

gas leasehold on the N/2 of Section 35 below 3,400 feet. Despite this knowledge, Amoco represented to Wilson in the agreement it prepared that the "Unit Area" included "all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit 'A.' " Exhibit A described "All rights below the base of the Hugoton" in Section 35.

Amoco did have a valid oil and gas lease on the N/2 of Section 35 from the Hugoton formation down to 3,400 feet, and the parties drilled and have apparently jointly operated a producing gas well from the Panoma Council Grove formation as the result of the 1980 agreement. Charles Wilson, Jr., assigned portions of his interests in Section 35 to the other non-operators who are parties to this action.

In mid-1995, Amoco began acquiring oil and gas leases covering formations below 3,400 feet in the area around Section 35. One of the leases acquired was from Parker & Parsley, who were successors in interest of the Santa Fe Land Improvement Company. This oil and gas lease covered the rights below 3,400 feet on the N/2 of Section 35.

Correspondence and negotiations between Amoco and Wilson followed, with Amoco first suggesting a farmout of Wilson's interests in the S/2 of Section 35. Wilson pointed to the description of the Unit Area in the operating agreement as covering all of Section 35 and contended his interests had the right to participate in any well drilled in the Unit Area. Wilson made this election before Amoco commenced drilling a well in Section 35. Amoco continued to contend that because it had obtained a new lease, the N/2 below 3,400 feet was not covered by the operating agreement. This was disputed by the Wilson interests who demanded that Amoco comply with the terms of the operating agreement. Amoco refused and commenced drilling down to the St. Louis formation 5,800 feet below the surface where it completed several producing oil wells.

Amoco contended in this declaratory judgment action that the failure of the title clause in the operating agreement and, alternatively, a mutual mistake, precluded the non-operators from claiming any interest in the new wells. Wilson argued that Unit Area was

designated by Amoco as all of Section 35, the title could not fail where no title existed, Amoco's claim to reform the agreement was barred by the statute of limitations, the mistake was unilateral not mutual, Wilson and Amoco intended to agree on a joint venture covering all operations below the base of the Hugoton formation in all of Section 35, Amoco prepared the agreement, and ambiguous language should be construed against it. Wilson and UMC counterclaim for damages or participation in the producing oil and gas wells under the terms of the operating agreement.

After discovery, both parties moved for summary judgment, making essentially the arguments raised by their pleadings as set forth above.

The trial court entered summary judgment in favor of Amoco. It found the operating agreement to be unambiguous, held the agreement was intended to cover only the oil and gas leases in existence on August 1, 1980, that Wilson could have requested a title opinion and learned of Amoco's lack of ownership below 3,400 feet, and both parties were knowledgeable and could have protected themselves with something more than a failure of title clause. The trial court held that to enforce the agreement to the described unit area would, in effect, be adding an after-acquired title clause. The court relied on *Drilling, Inc. v. Warren*, 185 Kan. 29, 340 P.2d 919 (1959), which was a "wash out" overriding royalty case where we held if the parties intended to have a covenant apply to unrelated leases subsequently acquired on the same property they would have put language in the granting clause of an overriding royalty assignment to that effect.

The Court of Appeals, in an unpublished opinion, affirmed the trial court, quoted much of the trial court's decision and relevant portions of the operating agreement, and ultimately held "the parties before this court are sophisticated and experienced in the oil and gas industry and quite able to protect themselves from potential unfavorable contract provisions. We are satisfied the parties here agreed upon a contract remedy for failure of title and should be bound by the contract provisions."

We granted Wilson's petition for review.

## Standard of Review

Judgment was granted on cross-motions for summary judgment. However, the standard of review which is often stated that the party against whom summary judgment is sought must have the record considered in the light most favorable to it, *Moorhouse v. City of Wichita*, 259 Kan. 570, 576, 913 P.2d 172 (1996), does not govern here because the legal effect of a written instrument is essentially a question of law for the appellate court to decide. We determine questions of law irrespective of the construction made by the trial court. *Ekan Properties v. Wilhm*, 262 Kan. 495, 503, 939 P.2d 918 (1997).

This brings into our consideration a number of well-settled rules of construction which we set forth in *Holley Energy, Inc. v. Patrick*, 239 Kan. 528, 534, 722 P.2d 1073 (1986), as follows:

"Whether an ambiguity exists in a written instrument is a question of law to be decided by the court. *Mobile Acres, Inc. v. Kurata*, 211 Kan. 833, 508 P.2d 889 (1973). Language in a contract is 'ambiguous' only when words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings. *Havens v. Safeway Stores*, 235 Kan. 226, 678 P.2d 625 (1984). In construing a written instrument the language used anywhere in the instrument should be taken into consideration and construed in harmony with all other provisions. *Heyen v. Hartnett*, 235 Kan. 117, 679 P.2d 1152 (1984). The document must be construed from its four corners and all provisions must be considered together and not in isolation. *Barnhart v. McKinney*, 235 Kan. 511, 682 P.2d 112 (1984). When an ambiguity appears in a contract or document, the language is construed against the party who prepared the instrument. *State v. Downey*, 198 Kan. 564, 426 P.2d 55 (1967)."

In a more recent case where the language of written instruments was at issue we noted:

"This court has held that 'where ambiguity or uncertainty of contract is involved in an agreement, the intention of the parties is not ascertained by resort to literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties.' " *Universal Motor Fuels, Inc. v. Johnston*, 260 Kan. 58, 63, 917 P.2d 877 (1996) (quoting *Richardson v. Northwest Central Pipeline Co.*, 241 Kan. 752, 758, 740 P.2d 1083 [1987]).

Additionally, Amoco argues that the following rules of interpretation apply: The language of the instrument must be given its plain and ordinary meaning without resort to further rules of construction. *Cornwell v. Jespersen*, 238 Kan. 110, 116, 708 P.2d 515 (1985). The courts must not construe written instruments by rejecting words of clear and definite meaning and substituting others therefor. *Geier v. Eagle-Cherokee Coal Mining Co.*, 181 Kan. 567, 572-73, 313 P.2d 731 (1957). Where there is a conflict between a specific provision and a general provision, preference is given to the specific provision. *Trego WaKeeny State Bank v. Maier*, 214 Kan. 169, 174-75, 519 P.2d 743 (1974). If there is a typed provision in an otherwise printed agreement, preference is given to the typewritten provision. *Desbien v. Penokee Farmers Union Cooperative Association*, 220 Kan. 358, 363, 522 P.2d 917 (1976).

Amoco acknowledges that doubtful language is to be construed against the drafter but points out we have said this is of little consequence where the parties are of equal bargaining power and each have had the opportunity to fully examine the proposed contract provision before the contract is executed. *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, Syl. ¶ 6, 738 P.2d 866 (1987).

With this diversity of rules we are to consider, we turn to the provisions of the MODEL FORM OPERATING AGREEMENT—1956 in issue here.

## Provisions of August 1, 1980, operating agreement

"WHEREAS, the parties to this agreement are owners of oil and gas leases covering and, if so indicated, unleased mineral interests in the tracts of land described in Exhibit 'A,' and all parties have reached an agreement to explore and develop these leases and interests for oil and gas to the extent and as hereinafter provided: . . .

"1. DEFINITIONS

. . . .

"(5) The term 'Unit Area' shall refer to and include all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit 'A.'

. . . .

"(7) All exhibits attached to this agreement are made a part of the contract as fully as though copied in full in the contract.

. . . .

## "2. TITLE EXAMINATION, LOSS OF LEASES AND OIL AND GAS INTERESTS.

"A. Title Examination:

"There shall be no examination of title to leases or to oil and gas interests except [the following language was typed in] as may be mutually agreed to by the parties. [The remaining portion of the form provisions in A. were struck through.]

"B. Failure of Title:

"Should any oil and gas lease, or interest therein, be lost through failure of title, this agreement shall nevertheless, continue in force as to all remaining leases and interests, and

"(1) The party whose lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have therefore paid, but there shall be no monetary liability on its part to the other parties hereto by reason of such title failure; and

"(2) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Unit Area by the amount of the interest lost; and

"(3) If the proportionate interests of the other parties hereto in any producing well theretofore drilled on the Unit Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interests (less operating costs attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well; and

"(4) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, or equipment previously paid under this agreement, such amount shall be proportionately paid to the party or parties hereto who in the first instance paid the costs which are so refunded; and

"(5) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the parties in the same proportions in which they shared in such prior production.

. . . .

## "3. UNLEASED OIL AND GAS INTERESTS

"If any party owns an unleased oil and gas interest in the Unit Area, that interest shall be treated for the purpose of this agreement as if it were a leased interest under the form of oil and gas lease attached as Exhibit 'B' and for the primary

term therein stated. As to such interests the owner shall receive royalty on production as prescribed in the form of oil and gas lease attached hereto as Exhibit 'B.' Such party shall, however, be subject to all of the provisions of this agreement relating to lessees to the extent that it owns the lessee interest.

## "4. INTERESTS OF PARTIES

"Exhibit 'A' lists all of the parties, and their respective percentage or fractional interests under this agreement. Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned by the parties as their interests are given in Exhibit 'A.' All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties shall also be owned by the parties in the same manner, it being understood and agreed that, regardless of the party's lease or tract from which production is obtained, all parties hereto shall bear their proportionate share of all Lessors royalties payable on such production not in excess of one-eighth ($\frac{1}{8}$). 'Proportionate share' of such Lessors royalties to be borne by the parties shall be their respective percentages set out in Exhibit 'A' hereof.

. . . .

## "10. TERM OF AGREEMENT

"This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal, or otherwise . . . .

. . . .

## "14. ACCESS TO UNIT AREA

"Each party shall have access to the Unit Area at all reasonable times, at its sole risk, to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator shall, upon request, furnish each of the other parties with copies of all drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Unit Area.

. . . .

## "22. LIABILITY OF PARTIES

"The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area. Accordingly, the lien granted by each party to Operator in Section 9 is given to secure only the debts of each severally. It is not the intention of the parties to create,

nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

. . . .

"EXHIBIT 'A' [typewritten]
"UNIT AREA, DEPTHS AND FORMATIONS COVERED

"Township 29 South, Range 40 West
Section 35: All rights below the base of the Hugoton
Stanton County, Kansas

ADDRESSES AND INTERESTS OF PARTIES
"OPERATOR:
AMOCO PRODUCTION COMPANY
Amoco Building                                                    50%
Denver, Colorado 80202

"NON-OPERATOR:
CHARLES B. WILSON, JR.
1616 WEST LOOP SOUTH, SUITE 310                                  50%
HOUSTON, TEXAS 77027

"EXHIBIT 'B' [typewritten]

"The interests contributed to the Unit Area by all of the parties signatory to the Operating Agreement to which this Exhibit 'B' is attached are oil and gas leasehold interests, as opposed to unleased oil and gas interests, and, for such reason, it is deemed unnecessary to attach a form of oil, gas and mineral lease to said Operating Agreement as otherwise required by Section 3 of said Operating Agreement."

## Contentions and arguments of Wilson and UMC

Wilson broadly states their issues on appeal by contending (1) Amoco cannot avoid the mistake it made in preparing the operating agreement by claiming it experienced a title failure, (2) the trial court erred in concluding it was the intent of the parties to have the operating agreement cover only those rights held by the parties on August 1, 1980, and (3) it was erroneous for the trial court to conclude the operating agreement had to contain an after-acquired lease provision to cover the rights acquired by Amoco in 1995. UMC more simply states the issue as "Are all of Amoco's oil and gas interests below the base of the Hugoton formation subject to the Operating Agreement between the parties?"

Wilson contends the failure of title provision only applies to an oil and gas lease or interest therein that is lost through title failure

and is not applicable here because Amoco could not lose what it never had. This contention is premised on the fact Amoco knew from the title examination in its file that it did not have any leasehold rights to the N/2 of Section 35 below 3,400 feet. Wilson argues that even if the failure of title clause.is applicable, it is to be applied "as of the time it is determined finally that the title failure has occurred," but by the time Wilson was notified, Amoco had obtained the valid Parker & Parsley lease to the N/2 below 3,400 feet of Section 35.

Although Amoco asked alternatively for reformation of the contract based on the mistake of the parties, Wilson points out the trial court's order appears to be based on a belief, unsupported by the record, that Amoco was unaware it did not own rights below 3,400 feet, when its lease records and title opinion in its files clearly showed otherwise.

Wilson's primary claim is that each party intended the agreement to cover what it was described to cover in Exhibit A, which is: "All rights below the base of the Hugoton" in Section 35, Township 29 South, Range 40 West, Stanton County, Kansas." Wilson argues Amoco must bear the burden of the mistake it made and may not be released from a fair and reasonable contract it entered into, citing *Anderson v. Overland Park Credit Union,* 231 Kan. 97, 104-05, 643 P.2d 120 (1982).

Wilson argues that joint title examinations were not required because Amoco was to check and rely on its title and Wilson was to check and rely on their title. Wilson argues this does not suggest that either had the obligation to examine the title of the other.

Wilson contends Kansas law reads an obligation to deal fairly and in good faith in every contract to protect the reasonable expectations of the parties. *Wayman v. Amoco Oil Co.,* 923 F. Supp. 1322, 1355 (D. Kan. 1996).

Wilson and UMC place great emphasis on the typewritten wording of Exhibit A covering "All rights below the base of the Hugoton" as setting forth the intention of the parties as to what area the agreement was to cover, no matter what some printed portion of the agreement might imply or when valid oil and gas leases thereon should be obtained.

Wilson argues the only logical reading of the operating agreement from its four corners was that the parties intended to develop jointly the Unit Area described in Exhibit A. Wilson points to Section 4 of the operating agreement as stating that " 'all production of oil and gas from the Unit Area shall be [owned] by the parties' as their interests are given in Exhibit 'A.' " Wilson argues that if the area to be covered by the agreement was to be limited, Amoco had the obligation to do so in Exhibit A and should have done so because of the information shown in its files.

Wilson distinguishes *Drilling, Inc. v. Warren*, 185 Kan. 29, 340 P.2d 919 (1959), relied on by Amoco and the trial court, as factually different because it relates to whether a later oil and gas lease is burdened by an overriding royalty interest, while the issue here is simply the extent of the present agreement and the construction that should be given to "all rights."

Wilson cites *First Nat'l Bank & Trust Co. v. Sidwell Corp.*, 234 Kan. 867, 678 P.2d 118 (1984), as a case helpful to its position. *Sidwell* is an "area of mutual interest" case which did not require any provision concerning later-acquired leases in order for such leases to be covered by the agreement. It is interesting to note that our opinion in *Sidwell* specifically stated in Syllabus ¶ 5:

> "When the relationship of joint adventurers exists, the parties stand in a close relationship of trust and confidence and are bound by the same standards of good conduct and square dealing as are required of partners. Each party has the right to demand and expect from the other full, fair, open and honest disclosure of everything affecting the relationship."

This is in effect the argument Wilson is making in their claim of Amoco being subject to fair dealing and honest disclosure when it negotiated for and drafted an operating agreement making the parties joint venturers, subject to all of the obligations of that relationship.

UMC's arguments mirror Wilson's, but it more succinctly contends that it is totally illogical for the parties to utilize "All rights below the base of the Hugoton" as the basis of their agreement while simultaneously excluding under the failure of title provisions what they are specifically including. UMC points to *Martin Exploration Co. v. Amoco Production Co.*, 637 So. 2d 1202 (La. App.),

*reh. denied* 644 So. 2d 1048 (La. 1994), as being a similar joint-operating agreement case. There, Exhibit A set out specific interest percentages, and Amoco (contrary to the position it takes in this case) argued that the specific interest provisions in Exhibit A controlled over Martin Exploration's argument that they were altered by a contribution clause in the operating agreement. The trial court and appellate court both agreed the specific typewritten statements of Exhibit A controlled.

Additionally, UMC states the literal language of the operating agreement here includes the after-acquired interest as falling within the Unit Area. The Unit Area was broadly described by Amoco in geographical terms (all of Section 35) and formations covered (everything below the Hugoton) instead of identifying specific oil and gas leases or interests. UMC argues this does not justify a narrow and tortured construction of the terms of an agreement broadly drawn.

## Contentions and arguments of Amoco

Amoco first argues the printed WHEREAS clause of the agreement speaks in the present tense ("the parties . . . **are** owners") and recites that the "parties have reached an agreement to explore and develop **these** leases," which makes the intent clear that the parties intended the agreement to cover the oil and gas leases they owned when the agreement was executed, not the Parker & Parsley lease it later acquired.

Amoco contends this intention is buttressed by the wording of the failure of title provision that should any oil and gas lease or interest therein be lost under Section 2B(2), "the interests of the parties shall be revised on an acreage basis . . . so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Unit Area by the amount of the interest lost." By this argument, Amoco justifies extracting from the terms of the agreement the N/2 below 3,400 feet of Section 35 because it represents the interest that was lost.

Amoco argues the agreement applies to existing oil and gas leases, not those "which may hereafter be acquired." To reach the result the non-operators champion, Amoco contends, wording

would have to be added to the operating agreement that the parties did not put there, a result Amoco claims to be contrary to the holding of *Drilling, Inc. v. Warren*, 185 Kan. 29.

Amoco argues Wilson relies too heavily on the typed wording of Exhibit A showing the agreement covered "All rights below the base of the Hugoton." It states Wilson's contentions use a general provision to nullify specific provisions designed to cover the loss of title. Amoco suggests Wilson's arguments rely on extrinsic facts which should not be considered in construing an unambiguous agreement.

Amoco states UMC improperly relies on *Kincaid v. Western Operating Co.*, 890 P.2d 249 (Colo. App. 1994), because the operating agreement there contained different terms and was found to be ambiguous so that extrinsic evidence was allowed, and the specific oil and gas leases which were to be subject to the agreement were determined by relying on oral testimony.

Amoco correctly points out that the Plummer lease contained a warranty of title provision and did not show on its face any depth limitation. This, according to Amoco, requires the failure of title provision to be applied.

Amoco speaks of this case as involving sophisticated parties who agreed that if either contributed an oil and gas lease that did not provide marketable title to explore for minerals within the Unit Area, their ownership therein would be revised on an acreage basis.

Analysis

In delving into the history of joint operating agreements, we find their necessity explained by Hazlett in *Drafting of Joint Operating Agreements*, 3 Rocky Mtn. Min. L. Inst. 277 (1957), as follows:

"In recent years it has become necessary to drill ever deeper and deeper, with the result that costs have skyrocketed to such extent that even the large company often finds it desirable to share the risk of an exploratory well with others. Moreover, competition for leases has become so intense that the operator who finds a likely prospect is rarely able to lease all of it for himself."

Hazlett's article admits it is not possible to anticipate every situation but points out when discussing "the title problem" that "the chances are that each party will be satisfied with its own titles." 3

Rocky Mtn. Min. L. Inst. at 284. This appears to be the factual background of the negotiations between Amoco and Wilson, as most of the title provisions of the model agreement were struck through and the agreement as typewritten reads that "[t]here shall be no examination of title to leases or to oil and gas interests except as may be mutually agreed to by the parties." This language places no burden on Wilson to examine Amoco's title as the courts below suggest he should have done to protect himself. The wording more logically shows that each party was satisfied with the condition of the title to the acreage each contributed to the Unit Area and each represented it had a valid oil and gas lease. Wilson in fact did. Amoco in fact, did not, and had documents in its possession showing it did not have a valid lease to the area below 3,400 feet.

Although the language of the 1956 form is in issue here, our attempt to find later discussions of failure of title provisions met with limited success. See Young, *Oil and Gas Operating Agreements*, 20 Rocky Mtn. Min. L. Inst. 197, 203 (1975). The wording of the failure of title provisions appears to have been subject to change in the 1977 model form, the 1982 model form, and the 1989 model form.

In an extensive article, Smith, *Operator Duties to Nonoperators*, 32 Rocky Mtn. Min. L. Inst. 12-1 (1986), the provisions of forms subsequent to the 1956 form were discussed. The applicability of the model form to parties who had lost a lease through inadvertent nonpayment of a delay rental or obtained renewal or extension of a lease subject to the agreement was specifically referred to. But, in recognizing there were situations not covered by the model form, Professor Smith pointed to *Texas Oil & Gas Corp. v. Hawkins Oil & Gas, Inc.*, 282 Ark. 268, 668 S.W.2d 16 (1984), where the operator, determining the non-operator had obtained leases from the wrong parties, secured leases on the outstanding interests from the correct lessors for itself. Professor Smith states there was a provision in the joint operating agreement which imposes the loss for failure of title upon the party contributing the defective interests (much like that which appears to be involved in this case); however, the Arkansas Supreme Court reasoned the parties were engaged in a joint venture and imposed a fiduciary duty on the

operator for the benefit of the non-operator by quoting the famous statement of Chief Justice Cardoza in *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928):

" 'Joint adventurers, like co-partners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. . . . A managing coadventurer appropriating the benefit of such lease without warning to his partner might fairly expect to be reproached with conduct that was underhand, or lacking, to say the least, in reasonable candor, if the partner were to surprise him in the act of signing the new instrument. Conduct subject to that reproach does not receive from equity a healing benediction.' " *Hawkins*, 282 Ark. at 270.

The Arkansas court, in granting the non-operator an interest in the leases obtained by the operator, said: "[T]he operator owed to the nonoperator a duty of fair dealing." 282 Ark. at 271.

Professor Smith's discussion suggested "the result reached in *Hawkins* is similar to the one which would have been reached if the operator had used information derived from the abstracts to acquire an interest which had once been in the Contract Area but had subsequently lapsed." (Citing *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401 [1960]; *Fuqua v. Taylor*, 683 S.W. 2d 735 [Tex. App. 1984], *reh. denied* Jan. 14, 1985.)

Two Kansas cases were referred to by Professor Smith: *Foley & Loomis v. Phillips*, 211 Kan. 735, 740, 508 P.2d 975 (1973) (fiduciary obligation of a joint venturer does not forbid further acquisition and development of leases in the general area by individual venturers so long as these leases are not embraced within the scope of the enterprise), and *First Nat'l Bank & Trust Co. v. Sidwell Corp.*, 234 Kan. 867, 678 P.2d 118 (1984) (a highly fact sensitive area, mutual interest case where oil and gas leases and interests later acquired within the area were deemed subject to the previous joint operating agreement because the parties were joint venturers and subject to the obligation and duties we have previously quoted from *Sidwell*, 234 Kan. 867, Syl. ¶ 5). Neither of these cases is sufficiently factually similar to our case to be deemed controlling,

but a flavor is provided as to the manner in which we should view the agreement between the parties herein.

Related cases within this area discussed in Boigon, *Liabilities and Relationships of Co-Owners under Agreements for Joint Development of Oil and Gas Properties*, 37th Oil & Gas Inst. 8-1 (1986), were *Hawkins*, 282 Ark. 268; *Oklahoma Company v. O'Neil*, 440 P.2d 978 (Okla. 1968); and the leading Texas case of *Rankin v. Naftalis*, 557 S.W.2d 940 (Tex. 1977). Boigon concludes: "The question most often raised in these cases is not whether a fiduciary obligation exists but its extent." p. 8-32. The two significant decisions from Kansas (*Foley* and *Sidwell*) referenced by Professor Smith were referenced by Boigon as affirming findings of joint ventures in connection with agreements for acquisition and development of oil and gas leases where development operations were delegated to one party.

It may be argued that the specific wording of the operating agreement in paragraph 22 relating to LIABILITIES OF PARTIES ("It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.") has the effect of removing from our consideration any thoughts of the parties as joint venturers with attendant fiduciary duties. An excellent discussion of this question is found in Lane and Boggs, *Duties of Operator or Manager to its Joint Ventures*, 29 Rocky Mtn. Min. L. Inst. 199 (1983). We will not here repeat the arguments for and against a finding that a fiduciary obligation between an operator and a non-operator is inherent, despite the absence of a mining partnership and the disclaimer in the agreement, where the parties undertake to develop property jointly, share profits and losses, and have joint control. However, in their conclusion, Lane and Boggs state:

"Parties entering into agreements for joint development of mineral properties must be aware that they may well be stepping into a new and different world—the world of the fiduciary—where traditional mining concepts of competition, hard bargaining, and jealous guarding of information are replaced with probate court principles of loyalty, acting for another's benefit, and full disclosure. No longer may parties enter into such relationships with the insouciant attitude that

businessworld concepts will exonerate their conduct. As courts increasingly demonstrate their willingness to extend fiduciary concepts to joint business operations, the role of the fiduciary operator becomes increasingly difficult and, indeed, dangerous. Serious financial consequences can attach to breaches—even inadvertent—of fiduciary duties." 29 Rocky Mtn. Min. L. Inst. at 238-39.

If the wording of the operating agreement was clear and decisive as to its application, the discussion above would have been academic and unnecessary. Such, however, is not the case, as it is unclear how the parties intended the wording of the joint operating agreement to be applied to the facts of this case.

We will not consider any of the extrinsic evidence which Wilson attempts to introduce into the record and argument. Both parties argued, and the courts below found, the agreement was unambiguous. Such a finding is highly questionable because of the conflicting arguments, but little would be accomplished by a remand decision where all parties were allowed to present parol evidence to further their contentions. We would, in the final analysis, be presented with the identical ultimate legal question we now decide.

Wilson's reliance on the Colorado case of *Kincaid v. Western Operating Co.*, 890 P.2d 249 (Colo. App. 1994), is diminished because the judgment there, on facts similar to our case, was based on the admission of extrinsic evidence to prove the intent of an ambiguous contract. The analysis of the case, however, is helpful.

In *Kincaid*, the parties had entered into a "Standard Operating Agreement" to develop two tracts referred to as §§ 26 and 27. The parties acquired leases to 100% of § 26, but only acquired 50% interest in § 27, with the other 50% held by the "Smith interests."

The parties drilled on § 26 and later the operator acquired the remaining 50% title to § 27 from the Smith interests. When this was inadvertently discovered by the non-operators, they claimed a right to participate in 100% of § 27 rather than the 50% the parties had acquired at the time the agreement was executed.

The operator contended (as does Amoco here) that the Smith interests were not subject to the agreement because the parties had not yet acquired those interests when the agreement was executed.

The trial court heard evidence and found that the agreement unambiguously included the newly acquired Smith interests. Alternatively, the trial court found "that if the Agreement were ambiguous, extrinsic evidence demonstrated the parties' intent that later acquired interests be included." 890 P.2d at 252. The Colorado Court of Appeals found the agreement to be ambiguous. The Court of Appeals determined the trial court's finding that the operating agreement included all interests in the specific geographic area described was supported by substantial competent evidence. 890 P.2d at 252.

The appellate court held this ruling did not add "after acquired property" language but used that phrase as descriptive of the interests acquired after the agreement was executed. Had either party in our case prevailed after a full and complete trial with extrinsic evidence admitted, *Kincaid* would be a valuable precedent to the prevailing party. As finally decided, however, while it is most helpful to Wilson on the "existing leases" and "later acquired property" arguments, it can be distinguished as factually different.

The other recent case relied upon by Wilson is *Martin Exploration Co. v. Amoco Production Co.*, 637 So. 2d 1202 (La. App. 1994). The controversy was again between a non-operator (Martin) and the operator (Amoco) who had entered into a "Model Form Operating Agreement, A.A.P.L. Form 610-1977." Martin argued that under the contribution clause of the agreement, Amoco was obligated to share acreage with it from a separate farmout agreement. Amoco relied on the specific designation of the parties' "respective percentage or fractional interests under this agreement," which were set forth in Exhibit A to the agreement.

In *Martin*, the trial court held, and it was affirmed on appeal, that Exhibit A—the typewritten insertion—should prevail over the printed contribution clause. The *Martin* decision lends credence to the Wilson/UMC argument that the specific language in Exhibit A should prevail over any of the printed provisions of the contract and requires that Amoco's later acquired oil and gas lease be subject to the parties' agreement.

The final case we need to discuss, which was relied on by Amoco, is *Drilling, Inc. v. Warren*, 185 Kan. 29. Warren had obtained two

oil and gas leases, assigned them to Drilling, and received back an overriding royalty assignment which was to be paid "under the terms and provisions of the present oil and gas lease thereon, or any extensions or renewals thereof." The assignment further stated the overriding royalty is to be deemed a "covenant running with the land and shall.be binding on the successors and assigns of the parties hereto."

Drilling completed a dry hole on one lease, and both leases were subsequently released. Cook, a stranger, later acquired a new oil and gas lease on the undrilled acreage. It was subsequently assigned to Drilling, which completed a commercial well thereon. Warren recorded the overriding royalty assignment on the earlier lease and claimed this interest applied to the later acquired lease.

Warren contended that allowing the first two leases to expire and be released was a scheme to "wash out" the overriding royalty through wrongful conduct and bad faith. The trial court held Warren failed to prove bad faith and, in fact, Drilling showed the second lease was acquired in good faith. But, the trial court found that by the terms of the instrument, the overriding royalty extended to *any* lease that Drilling subsequently acquired on the described land.

On appeal, our court reversed the trial court and quieted title in Drilling. We construed the overriding royalty assignment to apply only to the "present oil and gas lease," and the "covenant running with the land" statement related only to the described oil and gas lease. The holding is clearly correct. However, it is an overriding royalty case, not a joint operating case. It is factually and legally different and does not justify or substantiate the result reached by the courts below.

In reaching our decision which we hereafter set forth, we have considered every contention raised by Amoco, Wilson, and UMC, whether or not specifically referred to in this opinion.

Decision

The use of the present tense language in the WHEREAS clause does not limit the agreement only to leases in effect when the agreement was executed. More importantly, the clause refers to

Exhibit A, which is a more specific typewritten statement that covers all of Section 35 and "All rights below the base of the Hugoton." We hold the WHEREAS clause does not justify the construction that Amoco requests.

We are not enamored with any of the constructions of the failure of title provisions suggested by any of the parties. To apply the failure of title provision because the Plummer lease had no depth limitation, as Amoco suggests, completely ignores the fact Amoco possessed information, and its employees knew, or at least should have known, that the Plummer lease did not apply to depths below 3,400 feet. This appears to be a unilateral mistake, and we should not allow a party to obtain an advantage over another party to a joint operation agreement by questionable wording in the failure of title provision. Wilson's arguments that the failure of title clause should not be applied because one may not lose what one never had and their later contention that there was no title failure because by the time they were finally notified, the Parker & Parsley lease had already been obtained, are not easily adopted.

What failure of title provisions are best designed to cover is the loss to a third party who is not a part of the agreement. Such is not the case we face here. Professor Smith suggests in the article we previously cited that a failure of title provision does not apply to every fact situation. We hold this is such a situation. We will not apply the failure of title provision to give an advantage to Amoco for failing to disclose to Wilson that it did not have a valid lease below 3,400 feet to the acreage they proposed to operate in a joint venture.

We have previously discounted any argument that either party had the duty to examine the title of the other in order to protect itself. Such was not the intention of the wording they agreed upon in the title examination provision. This wording is more to Amoco's detriment for failing to own what it represented it owned than for Wilson being responsible to examine Amoco's title. We hold Wilson was not obligated to examine Amoco's title in August 1980.

The argument Wilson and UMC make which we find most compelling is that the typewritten wording in Exhibit A prevails. The parties specifically agreed as to what their agreement covered. It

was all of "Section 35" and "All rights below the base of the Hugoton."

The term "Unit Area" is defined in Section 1(5) as "all of the lands, oil and gas leasehold interests and oil and gas interests *intended to be developed and operated for oil and gas purposes under this agreement.*" (Emphasis added.) Those interests are described in Exhibit A. This makes the wording of Exhibit A of utmost importance. We hold it compels the construction of the agreement that is urged by Wilson and UMC.

The provision INTERESTS OF PARTIES states their interests "shall be owned by the parties as their interests are given in Exhibit 'A.' " This clearly shows the importance to be given to this exhibit.

Under the TERM OF AGREEMENT provision, the agreement remains in effect for so long as there is production from any part of the Unit Area. The Unit Area is all of Section 35. The result we reach gives effect and life to this provision. Likewise, under Section 14, each party is given access to all of the Unit Area and copies of geological data and information therefrom. This is accomplished by our construction of the agreement.

Amoco attempted an argument to its benefit in the construction of the wording of Exhibit B, but we more logically construe its language that there are no unleased oil and gas interests to be a representation that it directly violated.

Section 22, LIABILITY OF PARTIES, does say the parties do not intend to create a mining partnership or render them liable as partners. It does *not* say they are not joint venturers in the development of oil and gas interests in a designated area of designated property. It does not remove the duty of both the operator and non-operator to deal with each other in a fair and equitable manner.

In concluding their discussion of the *Duties of Operator or Manager to its Joint Ventures*, Lane and Boggs state:

"Every venture will have its own unique problems. In advising their clients on the resolution of those problems, counsel would do well to remember that judges, when faced with difficult questions in this area, harken back to the hard learned lessons of law school where few points were more strongly emphasized than the high obligations of the fiduciary. Given that predilection, the best advice for the

operator would be to live not by the letter of the law, but by the spirit of his fiduciary duty." 29 Rocky Mtn. Min. L. Inst. at 239.

This court's decision construes the agreement of the parties generally as the Wilson and UMC interests request and requires that Wilson and UMC be an integral part of the agreement as to all of Section 35. Our decision is in no small part guided by not only all of the rules of construction cited herein, but by the larger obligation to enforce the joint operating agreement as the parties clearly intended in its inception.

The result we reach does not add an "after acquired title" provision or rewrite the agreement but only recognizes that when the Parker & Parsley lease was acquired, the agreement was subject to being performed as the parties clearly originally intended.

This result is consistent with our prior Kansas cases of *Foley* and *Sidwell*. *Foley* limited the joint venture rights to the described area. It was not expanded to acreage not described in the agreement. Our result is similar. In *Sidwell*, the joint venture rights were protected within a described area of mutual interest. We said there, in much the same way we end here, that parties in a joint venture stand in a close relationship of trust and confidence and have the right to demand and expect from the other full, fair, open, and honest disclosure of everything affecting the relationship. To construe the agreement as Amoco asks would fly in the face of these directions.

The Court of Appeals and the trial court are reversed. The case is remanded to the trial court with instructions to determine the financial matters which now remain pending, in accordance with the joint operating agreement and attachments thereto entered into by the parties.