NOT DESIGNATED FOR PUBLICATION

No. 126,277

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STEPHANIE KNISLEY, Individually and on Behalf of Others Similarly Situated,
*Appellee*,

v.

EQUITY BANK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Oral argument held May 21, 2024. Opinion filed August 9, 2024. Affirmed.

*Luke R. VanFleteren* and *Lynn D. Preheim*, of Stinson LLP, of Wichita, and *Kevin Ranlett*, *Archis A. Parasharami*, and *Carmen N. Longoria-Green*, pro hac vice, of Mayer Brown LLP, of Washington, DC, for appellant.

*Richard S. Fisk*, of Beam-Ward, Kruse, Wilson & Fletes, LLC, of Overland Park, and *Troy D. Shelton*, pro hac vice, of Dowling PLLC, of Raleigh, North Carolina, for appellee.

Before COBLE, P.J., CLINE and ISHERWOOD, JJ.

PER CURIAM: Equity Bank appeals the denial of its motion to compel arbitration in a putative class action filed against it by Stephanie Knisley, an Equity Bank accountholder. Equity Bank contends the district court erred by denying its motion because it acted within the confines of a change-of-terms provision by unilaterally adding an arbitration provision to Knisley's account agreement, which she accepted by

1

continuing to use her account without formally opting out. After reviewing the issues presented, we find no error and affirm the district court's ruling.

FACTUAL AND PROCEDURAL BACKGROUND

Knisley had a checking account with Equity Bank that was governed by an accountholder agreement (the Agreement), which included the following "Amendments and Termination" section:

> "We may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. . . . Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s)."

The Agreement also contained a "Notices" section, which stated: "Written notice we give you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Notice to any of you is notice to all of you."

In April 2021, Equity Bank sent an email (the April 2021 Email) with the subject line "Notice of Important Change in Terms" to Knisley at the email address she had provided to receive electronic account statements and other notices regarding her account. The body of the email began by stating in large, bold letters: "**Update: Your Privacy Choices and Changes to Your Account Terms**." The email further directed Knisley, again in large bold letters, to "**Please review important updates to your terms**

2

**and conditions with Equity Bank**," and provided bullet points of items to review. Relevant to this appeal, the first bullet point stated a "**Notice of Important Changes in Terms** (adds an Arbitration requirement and waives your right to participate in a class action, grants you the right to OPT Out of the change.)" The underlined text contained a hyperlink, which if clicked opened a copy of the updated terms (the Arbitration Agreement).

The Arbitration Agreement began by providing:

"The following is notice of an important change to the Equity Bank Terms and Conditions of Your Account. The change involves the implementation of *an Arbitration Provision and Class Action Waiver*. You can opt out of the Arbitration Provision as provided below and you will not lose any of the rights and benefits of your accounts. *PLEASE READ THIS DOCUMENT CAREFULLY*."

The first paragraph of the Arbitration Agreement explained that for any "Claims" which could not be settled informally,

"you agree that any and all Claims that are threatened, made, filed or initiated after the Effective Date (defined below) of this Arbitration and Waiver of Class Action provision ('Arbitration Agreement'), even if the Claims arise out of, affect or relate to conduct that occurred prior to the Effective Date, shall, at the election of either you or us, be resolved by binding arbitration administered by the American Arbitration Association ('AAA') in accordance with its applicable rules and procedures for consumer disputes ('Rules'), whether such Claims are in contract, tort, statute, or otherwise. . . . Either you or we may elect to resolve a particular Claim through arbitration, even if one of us has already initiated litigation in court related to the Claim, by: (a) making written demand for arbitration upon the other party, (b) initiating arbitration against the other party, or (c) filing a motion to compel arbitration in court. AS A RESULT, IF EITHER YOU OR WE ELECT TO RESOLVE A PARTICULAR CLAIM THROUGH ARBITRATION, YOU WILL GIVE UP YOUR RIGHT TO GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS. This Arbitration Agreement shall be interpreted and enforced in

3

accordance with the Federal Arbitration Act set forth in Title 9 of the U.S. Code to the fullest extent possible, notwithstanding any state law to the contrary, regardless of the origin or nature of the Claims at issue."

The Arbitration Agreement added that the "Effective Date" was

"the 31st day after we provide it to you . . . unless you opt-out in accordance with the requirements of the RIGHT TO OPT-OUT provision below. If you receive your statements by mail, then the Arbitration Agreement was provided to you when it was mailed. If you receive your statements electronically, then it was provided to you when you were sent notice electronically."

Under the Right to Opt-Out provision, the Arbitration Agreement explained:

"You have the right to opt-out of this Arbitration Agreement and it will not affect any other terms and conditions of your relationship with us. To opt out, you must notify us in writing of your intent to do so prior to the Effective Date (defined above). Your opt-out must be sent to us at Equity Bank—7701 E. Kellogg, Wichita, KS 67207, ATTN: Senior Compliance Officer or ArbitrationOptOut@equitybank.com prior to the Effective Date. Your notice of intent to opt out can be a letter that is signed by you or an email sent by you that states 'I elect to opt out of the Arbitration Agreement' or any words to that effect."

In January 2022, Knisley filed a putative class-action petition against Equity Bank, alleging that Equity Bank's practice of charging overdraft fees on insufficient funds breached both the terms of the Agreement and the covenants of good faith and fair dealing, served to unjustly enrich Equity Bank, and violated the Kansas Consumer Protection Act.

Before filing an answer, Equity Bank moved to dismiss, or in the alternative to stay Knisley's petition and compel arbitration based on the Arbitration Agreement in its email. Along with a supporting memorandum, Equity Bank included:

- A declaration from Tina Call—Equity Bank's executive vice president and Chief Risk Officer—attesting that a review of Equity Bank's records showed: (1) that Knisley had elected to receive electronic notices for her account, (2) that the Equity Bank system showed no indication the April 2021 Email was not successfully delivered to Knisley, (3) that Knisley did not provide any written notice to opt-out within 31 days of receiving the April 2021 Email or Notice, and (4) that Knisley continued using her bank account thereafter;
- Defendant's Exhibit A, a copy of the Agreement that was in effect at the time Knisley received the April 2021 Email and Notice;
- Defendant's Exhibit B, a copy of the April 2021 Email; and
- Defendant's Exhibit C, containing a copy of the Arbitration Agreement.

Knisley responded to Equity Bank's motion, contending that Equity Bank could not "change" the terms of the Agreement by "adding" the Arbitration Agreement and that Equity Bank failed to provide reasonable notice of the changes because the Agreement required written notice by U.S. mail. Knisley also asserted she could not recall receiving the April 2021 Email nor locate a copy of it, further declaring that she never assented to the Arbitration Agreement and class action waiver and would not have assented had she been aware of those provisions.

Equity Bank replied to Knisley's contentions, disagreeing with her narrow reading of the term "change" and alternatively, arguing that Knisley received proper notice of the Arbitration Agreement and subsequently failed to opt out by continuing to use her account.

The district court held a hearing over Zoom in January 2023 to consider the parties' arguments on Equity Bank's motion. At the hearing, Equity Bank argued this court's decision in *Duling v. Mid American Credit Union*, 63 Kan. App. 2d 428, 530 P.3d 737 (2022), illustrated the "ultimate issue" in this case, which was whether Knisley "received a valid actual notice and right to opt out of a proposed arbitration agreement" and "whether there was an objective manifestation at the outset to the [A]rbitration [A]greement." Unlike in *Duling*, Equity Bank noted the April 2021 Email was a reasonable method of notice because Knisley had agreed to receive electronic notices about her account. And thus, it contended Knisley received "a very clear, conspicuous method of opting out" of the Arbitration Agreement, and the notice was reasonable because many others who received the email had opted out. Equity Bank also argued based on *Duling* that "the definition of change in Kansas law . . . and the dictionary definition of that term is broad enough to include the addition of an arbitration agreement, especially when you consider all of the other provisions in the agreement that deal with disputes between the parties." Equity Bank distinguished the cases relied on by Knisley as mostly dealing with "unilateral changes" that were "materially adverse" to the plaintiffs in those cases.

Knisley responded with three main points: (1) There was no "serious factual argument" of "an outward manifestation of any contract including an arbitration agreement," (2) Equity Bank failed to provide effective written notice by U.S. mail as required, and (3) the parties had "contractually agreed in advance [to limit] the types of modifications or revisions that [Equity Bank] could make" but Equity Bank had "treated a nonresponse as some form of consent." Knisley agreed *Duling* was "highly relevant" because the language of the change-in-terms clauses in both cases were "identical." Knisley also pointed out that the overdraft fees at issue in the petition were assessed before Equity Bank sought to add the arbitration provision. Knisley further contested Equity Bank's assertions that there were terms in the Agreement dealing with dispute resolution which Equity Bank could "change" by adding the Arbitration Agreement.

6

Following the hearing, the district court denied Equity Bank's motion, finding Equity Bank had failed to carry its burden to show that the parties entered a contract to compel arbitration and in which Knisley waived her right to participate in a class action. In particular, the court first found that the Agreement did not define "'change'" and "contains no explicit discussion of the methods of dispute resolution," despite including "references" to "'asserting a claim', 'legal action' and 'damages.'" Thus, the court interpreted the ambiguity in that term against Equity Bank as the drafter of the Agreement, concluding that "[Equity Bank] may not add an arbitration clause as a 'change' to the agreement." Applying *Duling*, the court construed Equity Bank's "attempt to add the arbitration/class action waiver clause as an offer . . . to modify their existing agreement."

The district court then found that Equity Bank's offer was "'clear and specific'" but that it did not specifically state that "continued use of the account by Ms. Knisley constitutes acceptance of the offer." The court found no issue with the notice by email, since it was construing the Arbitration Agreement as a new offer that was not governed by the mail notice provisions of the Agreement.

Moving on, the district court concluded that Knisley's silence could not be considered an "'unconditional and positive acceptance'" because "[t]here was clearly no meeting of the minds with regard to any newly proposed contract containing an arbitration clause and class action waiver. [Equity Bank]'s offer was not accepted." Finally, the court explained that it had considered the parties' relationship, but concluded that "allowing [the prior] course of dealing to equal assent to the newly proposed contract by Equity would nullify the Court's analysis above, and, in effect, allow 'change' to include 'add', a benefit to Equity that the Court is unwilling to grant." The court concluded by explaining:

7

"[T]he idea that [Equity Bank] can offer any type of new contract provision and simply add an opt out clause can be taken too far, as it has been here. Assent requires some sort of affirmative statement from [Knisley], and mere silence under these circumstances is not sufficient; it is not 'unconditional and positive acceptance'."

Equity Bank timely appealed.

REVIEW OF EQUITY BANK'S APPELLATE CHALLENGES

Equity Bank argues the district court erred in denying its motion to compel arbitration, first challenging the court's finding that the change-in-terms provision did not authorize Equity Bank to unilaterally "add" the Arbitration Agreement where there were no preexisting terms in the Agreement governing dispute resolution. Second, Equity Bank challenges the court's finding that Knisley did not validly assent to the Arbitration Agreement through her silence, a conclusion the court made after treating the Arbitration Agreement as an offer to modify the Agreement outside the scope of the change-in-terms provision. Finally, Equity Bank contends the district court erred in invalidating the Arbitration Agreement, arguing the Federal Arbitration Act preempts using state contract law that is overly hostile to arbitration.

*Jurisdiction*

To begin, a district court's decision denying a motion to compel arbitration is a final and appealable order. K.S.A. 5-450(a)(1); see *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 435, 153 P.3d 550 (2007); *NEA-Topeka v. U.S.D. No. 501*, 260 Kan. 838, 841, 925 P.2d 835 (1996).

*Standard of review*

The parties agree that most of the issues presented here involve an unlimited standard of review, particularly the first and third issues as outlined above. Appellate courts exercise unlimited review over the interpretation of the terms and legal effect of written instruments, including whether a written instrument is ambiguous, and this court is not bound by the lower court's interpretations or rulings. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018); see also *Anderson*, 283 Kan. at 436 ("An appellate court reviews an alleged arbitration agreement like any other contract, applying a de novo standard of review."). Likewise, preemption is a question of law over which this court exercises de novo review. *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 294, 255 P.3d 1186 (2011).

But as Knisley points out, this court in *Duling* treated the district court's finding that a party failed to meet its burden to prove the existence of an enforceable arbitration agreement as a negative finding, which involves a highly deferential standard of review. *Duling*, 63 Kan. App. 2d at 435 (citing *Mohr v. State Bank of Stanley*, 244 Kan. 555, 567, 770 P.2d 466 [1989] ["'A finding that the plaintiff did not sustain the burden of proof is a negative finding.'"]; *Short v. Sunflower Plastic Pipe, Inc.*, 210 Kan. 68, 74-75, 500 P.2d 39 [1972] [applying negative finding test when reviewing district court's order finding that a contract did not exist]). Appellate courts reviewing a negative finding will uphold it unless the challenging party proves the district court arbitrarily disregarded undisputed evidence or relied on some extrinsic consideration such as bias, passion, or prejudice to reach its decision. See *State v. Douglas*, 309 Kan. 1000, 1002-03, 441 P.3d 1050 (2019).

Although Equity Bank does not directly dispute the applicability of the negative finding standard, the Kansas Supreme Court has held it applies only to negative *factual* findings and not merely any ruling adverse to a party bearing the burden of proof. See *State v. Marx*, 289 Kan. 657, 661, 215 P.3d 601 (2009) (negative finding standard should

9

not be "applied to undermine the de novo, independent review of legal questions with which appellate courts are properly imbued"); see also *State v. Garza*, 295 Kan. 326, 331, 286 P.3d 554 (2012) (declining to apply negative finding standard on appeal from motion to suppress because resolving appeal only required statutory interpretation).

Typically, the existence of a contract presents a question of fact that is reviewed on appeal for substantial competent evidence. *Price v. Grimes*, 234 Kan. 898, 904, 677 P.2d 969 (1984); *O'Neill v. Herrington*, 49 Kan. App. 2d 896, 903, 317 P.3d 139 (2014). Similarly, whether a particular term of a written contract has been modified or waived by a later agreement is a question of fact. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1209, 308 P.3d 1238 (2013). But as Equity Bank points out, when the legally relevant facts of a contract's formation are undisputed, the existence and terms of a contract are *questions of law* subject to de novo review. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). As below, Equity Bank contends that Knisley's silence constituted her assent, but neither the fact of Knisley's silence nor that she continued using her account after April 2021 has ever been disputed. Thus, applying such a deferential standard to review the district court's legal determination that Knisley's silence did not constitute her assent to the Arbitration Agreement would not be appropriate because that issue can be reviewed de novo.

As a final point before moving on to the analysis, we note that Knisley argues several issues that would generally be considered when evaluating the formation of a contract, such as the sufficiency of notice and that the arbitration provision violates the duty of good faith and fair dealing. The district court's ruling briefly addressed notice but found that email notice was reasonable under the circumstances because it treated the Arbitration Agreement as a new offer that was not controlled by the mail notice provision of the Agreement. We decline to review Knisley's claims involving these issues because Knisley failed to object to any inadequacy in the district court's factual findings. *State v. Jones*, 306 Kan. 948, 959, 398 P.3d 856 (2017) ("When there is no objection to a trial

court's findings, this court presumes that the trial court found all facts necessary to support its judgment."). Knisley also did not cross-appeal from any adverse rulings. *Lumry v. State*, 305 Kan. 545, 553-54, 385 P.3d 479 (2016) (noting K.S.A. 2015 Supp. 60-2103[h]'s requirement that an appellee file a notice of cross-appeal from adverse rulings to obtain appellate review of those issues). Thus, the only questions we must resolve are those raised by Equity Bank.

*Did the district court err in interpreting the change-in-terms provision?*

Equity Bank begins by challenging the district court's finding that the change-in-terms clause did not authorize Equity Bank to add the Arbitration Agreement as a new dispute resolution provision through a "change" to the Agreement. Addressing this challenge also requires determining whether the district court correctly concluded that the Agreement lacked any dispute resolution provisions which Equity Bank could thereby change to include the Arbitration Agreement.

A. *Equity Bank could not add a new term under the change-in-terms provision.*

Equity Bank focuses its argument on discussing whether the plain language of the Agreement, particularly the term "change" as it is used in the Agreement's change-in-terms clause, authorized Equity Bank to add the Arbitration Agreement. As stated, the Agreement stated that Equity Bank "may change any term of this agreement." The district court found the provision was subject to at least two interpretations since "'change' can be interpreted as to include 'addition' or not to include 'addition.'" As a result, the court interpreted that ambiguity against Equity Bank as the drafter of the Agreement, concluding that Equity Bank could not add the Arbitration Agreement as a change to the Agreement.

11

"""The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.""" *Russell v. Treanor Investments*, 311 Kan. 675, 680, 466 P.3d 481 (2020). A written instrument will not be found to be ambiguous unless two or more meanings can reasonably be construed from the contract. The court will not strain to find an ambiguity where, in common sense, there is none. *Greer v. Eby*, 309 Kan. 182, 192-93, 432 P.3d 1001 (2019).

> "Where ambiguity or uncertainty is involved in a written instrument, the parties' intentions are ascertained by considering the language used, the circumstances existing when the instrument was made, the objective of the written instrument, and other circumstances tending to clarify the real intention of the party or parties. [Citation omitted.]" *In re Marriage of Gerleman*, 56 Kan. App. 2d 578, 589, 435 P.3d 552 (2018).

See *Amoco Production Co. v. Wilson, Inc.*, 266 Kan. 1084, 1088, 976 P.2d 941 (1999). Ambiguities in a written instrument are construed against the drafter. See *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 (2002).

To begin, focusing solely on the term "change" does not entirely answer the question of whether Equity Bank could add the Arbitration Agreement to the Agreement. Determining what Equity Bank was authorized to "change" cannot be interpreted correctly without also considering what the parties intended by the rest of the clause "any term of this agreement." Admittedly, the district court specifically found "change" to be ambiguous, but this court's standard of review for interpreting the contract is de novo. Moreover, appellate courts can affirm the district court when its conclusion is right for the wrong reasons. See *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 100, 106 P.3d 492 (2005).

Now, the parties frame their discussion around whether the change-in-terms clause specifically allowed Equity Bank to add the Arbitration Agreement. Yet the proper

framing of the question we must answer is more generally whether the change-in-terms clause authorized Equity Bank to add *any* new terms to the Agreement. Under that framing, we agree with Equity Bank and find that the language used in the change-in-terms clause was not ambiguous. But we reject Equity Bank's interpretation of the clause as allowing it to add a new term to the agreement. The plain meaning of the words "change any term of this agreement" clearly only authorized Equity Bank to change terms that already existed in the Agreement.

The district court stated in its ruling that it would "follow the precedent of *Duling*," so some discussion of that case is relevant here. As here, the district court in *Duling* denied a motion to compel arbitration because the addition of an arbitration provision was essentially a new term not contemplated by the initial agreement. On appeal, we agreed but ultimately assumed without deciding that the contract's change-of-terms provision authorized the defendant to add new terms to the agreement. *Duling*, 63 Kan. App. 2d at 439. To that end, *Duling* does not discuss whether the plain meaning of the clause authorized Equity Bank to "add" new terms to the Agreement.

Equity Bank cites several cases from other jurisdictions in which a court found— though without much discussion—that the language used in a change-in-terms clause was not ambiguous. See e.g., *Beneficial Nat. Bank, U.S.A. v. Payton*, 214 F. Supp. 2d 679, 687 (S.D. Miss. 2001) ("[T]here is no practical distinction between a 'change' and an 'amendment' to the terms of the agreement."); *Bank One, N.A. v. Coates*, 125 F. Supp. 2d 819, 831 (S.D. Miss. 2001) (finding a bank could add an arbitration provision because the language authorizing it to "change or amend the terms of this Agreement," was "simpl[e], unambiguous[] and without limitation"), *aff'd* 34 F. Appx. 964 (5th Cir. 2002); *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574, 577-78 (W.D.N.C. 2000) (finding the phrase "'the right to change the terms of this Agreement at any time'" to be "clear and unambiguous"). But none of the cases mentioned in Equity Bank's brief involved identical language to the Agreement here, or otherwise discussed the plain meaning of similar language.

13

A case Knisley cites in her brief is instructive because it contained a change-in-terms clause with identical language. *Decker v. Star Financial Group, Inc.*, 204 N.E.3d 918 (Ind. 2023). Unlike this case, the district court in *Decker* had granted a motion to compel arbitration based on an arbitration provision that was newly added under the change-in-terms clause. The Indiana Supreme Court reversed on appeal, explaining:

> "The Bank proceeded here as if the account agreement's change-of-terms clause gave it a blank check to amend the agreement any way it saw fit to fend off threatened litigation. But [the change-in-terms provision]—which the Bank itself wrote—is not so elastic. This section does not say the Bank can change the agreement however it wants. If the Bank wanted such flexibility, it might have given itself the power to 'change this agreement' as desired. Instead, the section is more limited in scope. It limits the Bank to changing 'any term of this agreement.' Words matter. The difference between a far-reaching power to amend '**this** agreement' and the narrower power to amend '**any term** of this agreement' makes all the difference on this record. The latter—which governs here—limits the Bank to modifying the terms that existed in the original account agreement. Relevant here, the original agreement contained neither a general dispute-resolution provision nor a specific arbitration or no-class-action provision. Thus, there was not 'any term' of that agreement the Bank could 'change' to effectuate the result it sought here through its addendum. Because the original account agreement did not mention dispute resolution generally or arbitration or class action specifically, [the change-in-terms provision] did not permit the Bank to add such provisions by amendment. To conclude otherwise would violate [the provision]." 204 N.E.3d at 921.

In so doing, the court noted it was following the reasoning of *Badie v. Bank of America*, 67 Cal. App. 4th 779, 786, 803, 79 Cal. Rptr. 2d 273 (1998), a California Court of Appeal decision holding that a change-of-terms clause allowing a bank to "change any term, condition, service or feature of your Account at any time" was ambiguous and interpreting the language against the bank as the drafter. See *Decker*, 204 N.E.3d at 921-22. Yet unlike *Badie*, the *Decker* court resolved the case without needing to consider whether the change-in-terms clause was ambiguous because it found the plain meaning of

14

the text demonstrated that the bank could only "change a specific kind of term by amendment—namely, only those terms existing in the original account agreement." 204 N.E.3d at 922.

Equity Bank references several dictionary definitions of the term "change" and asks us to conclude it broadly includes the ability to add new terms to the Agreement, citing Merriam-Webster Dictionary, at https://www.merriam-webster.com/dictionary/change (defining as "to make different"—even "radically different"; to "alter," to "transform," or "to replace with another"). Another definition of change includes "to put or take (a thing) in place of something else; substitute for, replace with, or transfer to another of a similar kind," or "to cause to become different; alter; transform; convert." Webster's New World College Dictionary 249 (5th ed. 2018).

Equity Bank also points out the Kansas Supreme Court has construed change in the statutory interpretation context as "including 'to make different in some particular,' and 'to replace one with another.'" *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 460, 124 P.3d 57 (2005) (quoting Webster's New Collegiate Dictionary [1980]). In *Griffin*—which involved determining whether evidence related to a successor design of a vehicle was admissible in a products liability action—the Kansas Supreme Court ruled that the term "'change in design' . . . would encompass a 'wholly different design.'" 280 Kan. at 460.

As for defining the word "any," the definition includes "one, no matter which, of more than two," and "without limit." Webster's New World College Dictionary 64 (5th ed. 2018). Relying on the Merriam-Webster's Dictionary online, the Kansas Supreme Court has said "[t]he ordinary and plain meaning of the term 'any' thus connotes something without limits." *State v. Sandoval*, 308 Kan. 960, 963-64, 425 P.3d 365 (2018) ("Merriam-Webster defines 'any' as:  [1] 'one or some indiscriminately of whatever kind'; [2] 'one, some, or all indiscriminately of whatever quantity'; and (3) 'unmeasured or unlimited in amount, number, or extent.' [Online ed. 2017].").

15

Like in *Decker*, we need not resort to an ambiguity analysis to construe the change-in-terms clause against Equity Bank because the plain language is clear. The common definitions of change mentioned above only include additions in the context of replacing something that already exists. Moreover, the key distinction between the change-in-terms clause here and the clauses in cases cited by Equity Bank lies in using the qualifier "any" along with the singular "term," because there is no reasonable way to interpret this language as allowing a party to change a term that is not already present in the Agreement. Based on these definitions mentioned, "any" can be used both in the singular and plural to describe something. But because "any" is specifically describing "term of this agreement," it would only make sense grammatically to read it as referring to those terms already present. Had the clause stated, "may change *the terms* of this Agreement," Equity Bank would have had the ability to add new terms to the collective "terms of this Agreement." But because the clause is singularly directed at "chang[ing] any term," Equity Bank could only change terms that already existed. To be clear, Equity Bank would still be able to effectively "add" a new provision by replacing an existing term on the same subject, just like article 2, section 16 of the Kansas Constitution requires legislative amendments to repeal the prior sections being amended.

As a final note, Equity Bank makes several ancillary points to establish that this interpretation is unreasonable. First, Equity Bank claims it would be precluded from adding "critically important" new terms or ones that benefit customers, such as new security measures, rewards programs, or features incorporating new technologies. Equity Bank also emphasizes the benefits of arbitration and how the arbitration provision here was "particularly favorable for customers" because of the cost-savings and simple procedures that would be used to resolve disputes. But we need not delve into discussing hypothetical provisions Equity Bank might consider adding to the Agreement or even engage with the parties' debate about the advantages or disadvantages of arbitration. As explained, the question before us is whether the plain meaning of the change-in-terms clause authorized Equity Bank to add new terms to the Agreement. For this question, the

16

fact that the "new" term in question is an arbitration provision only matters to determine whether there were existing terms that cover that same subject matter.

B. *The Agreement did not contain dispute resolution provisions.*

We next examine whether the district court erred in finding the Arbitration Agreement did not constitute a modification of any existing dispute resolution terms. On this point, the district court found that "while there are references in the agreement to 'asserting a claim', 'legal action' and 'damages', . . . the agreement contains no explicit discussion of the methods of dispute resolution."

Equity Bank highlights several provisions in the Agreement that purport to show the parties understood disputes would be resolved in court and cites *Scherk v. Alberto Culver Co.*, 417 U.S. 506, 519, 94 S. Ct. 2449, 41 L. Ed. 2d 270 (1974), in which the Supreme Court described "an agreement to arbitrate . . . [as] a specialized kind of forum-selection clause." But as Knisley points out, none of the provisions highlighted remotely resemble a forum selection clause or otherwise concern procedures for resolving disputes *between* the parties. Moreover, at no point in its brief does Equity Bank explain how the Arbitration Agreement replaced or modified any of these existing terms.

For instance, Equity Bank asserts the Agreement states that disputes are decided under "applicable federal laws" and the "laws of the state of Kansas" with account holders "'liable for [the bank's] costs as well as for [its] reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving [the] account.'" But the full context of these provisions shows they were not intended to dictate dispute resolution methods; they merely convey what laws apply and how Knisley could be held liable under the Agreement for disputes "involving [her] account" initiated by external actors.

Equity Bank also points out that the Agreement authorizes it to place account funds on hold during a "legal proceeding to determine the merits of the claim." But again, the full context of this provision shows that it applies to claims by nonparties to the Agreement against Knisley's account:

> "**Resolving Account Disputes**. We may place an administrative hold on the funds in your account (refuse payment or withdrawal of the funds) if it becomes subject to a claim adverse to (1) your own interest; (2) others claiming an interest as survivors or beneficiaries of your account; or (3) a claim arising by operation of law. The hold may be placed for such period of time as we believe reasonably necessary to allow a legal proceeding to determine the merits of the claim or until we receive evidence satisfactory to us that the dispute has been resolved. We will not be liable for any items that are dishonored as a consequence of placing a hold on funds in your account for these reasons."

Equity Bank next asserts that the Agreement contains provisions describing

> "situations in which the account holder must 'assign to [the bank]' the right to take 'legal actions'—again referring to lawsuits in court—against various third parties, as well as the account holder's commitment 'to cooperate with [the bank] in any legal actions that [the bank] may take against such persons.'"

Again, these provisions explicitly apply only to legal proceedings against third-party payees initiated by Equity Bank, specifically those arising if Equity Bank incurs damages or expenses because of a stop payment initiated by Knisley.

Lastly, Equity Bank points out that the Agreement "discusses how the parties will handle any 'subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to [the] account,' including what happens to disputed funds while awaiting 'a final court determination.'" Although Equity Bank is correct that the Agreement defines these types of orders as "legal action[s]," the

full language of that provision undercuts any suggestion that it governs dispute resolution:

> "**Legal Actions Affecting Your Account**. If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or *similar order relating to your account* (termed 'legal action' in this section), *we will comply with that legal action*. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in *responding to any legal action* (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions." (Emphases added.)

The emphasized language demonstrates that this provision of the Agreement was intended to apply only to various types of court orders served on Equity Bank that would adversely affect Knisley's account. See *Woessner v. Labor Max Staffing*, 312 Kan. 36, 48, 471 P.3d 1 (2020) (applying *ejusdem generis* canon of construction). If this provision applied to any legal proceedings initiated by Knisley against Equity Bank, then it would appear to allow Equity Bank the unfettered right to freeze her account during any lawsuit initiated by Knisley until a final court determination, as well as charge Knisley for the entirety of its legal fees.

For these reasons, we agree with the district court and find that the Agreement contained no existing dispute resolution provisions. As a result, Equity Bank could not use the change-in-terms clause to add a new dispute resolution provision containing an arbitration requirement.

*Did the district court err in concluding Knisley's silence did not constitute assent?*

As Equity Bank notes, the district court treated its attempt to add the Arbitration Agreement as an offer to modify the Agreement by determining whether the basic contractual elements had been satisfied. The court ultimately concluded that "[i]t is impossible to describe" Knisley's silence under the circumstances as an "'unconditional and positive acceptance'" of the Arbitration Agreement because "[a]ssent requires some sort of affirmative statement." Equity Bank disagrees with this conclusion, contending the court ignored relevant Kansas caselaw stating that silence coupled with accepting the benefits of an offer or failing to opt-out can reflect acceptance.

While Equity Bank also provides examples of decisions from all 50 states in which a court has held similarly to its preferred outcome, we believe this case can be resolved using authorities based in Kansas law.

To begin, the parties agree that resolving this appeal turns on whether Knisley's silence could be considered her assent to the arbitration provision. Kansas law defines the requisite assent to form a contract as a "meeting of the minds on all the essential elements," or "[a]n unconditional and positive acceptance." *Sandoval*, 295 Kan. at 282; see also *Fast v. Kahan*, 206 Kan. 682, 685, 481 P.2d 958 (1971) (meeting of the minds required for proposed modification). "To constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract." *Steele v. Harrison*, 220 Kan. 422, Syl. ¶ 3, 552 P.2d 957 (1976).

In explaining its ruling in this case, the district court began by noting that "[s]ilence is generally not considered acceptance," and citing *Caterpillar Tractor Co. v. Sickler*, 149 Kan. 457, 460, 87 P.2d 503 (1939), as its primary support. The district court

20

then also cited Restatement (Second) of Contracts § 69, comment a (2022), and *PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C.*, 225 F.3d 974, 981 (8th Cir. 2000). Yet, despite these citations, it quickly becomes clear when reviewing the district court's ultimate conclusion that the district court failed to properly consider whether any recognized exceptions applied to the general rule that silence is not considered acceptance.

As Equity Bank points out, the main holding of *Caterpillar Tractor Co.* was not simply recognizing the "general rule," because the Kansas Supreme Court specifically later held in the case that a party's "[a]ssent may be indicated by conduct or acquiescence." 149 Kan. at 460. The dispute in *Caterpillar Tractor Co.* arose after the plaintiff obtained a judgment and filed a garnishment against the defendants for proceeds of the sale of grain, after which the defendants' lessor intervened to claim an interest in the funds and grain based on unpaid rent. A jury found that the parties agreed to modify the lease by removing the requirement of payment of cash rental after the expiration of the original lease term. The Kansas Supreme Court affirmed this ruling, rejecting the lessor's argument that his "mere silence" could not constitute an acceptance of the defendants' offer to no longer pay cash rent. 149 Kan. at 460. In particular, the court explained that

> "[b]y his silence he caused [lessees] to expend time and money in putting in a crop. He accepted the benefits of this expenditure. Under such circumstances he brought himself within the rule laid down in 6 R.C.L. 600. There it is said: 'Assent may be indicated by conduct or acquiescence.'" *Caterpillar Tractor Co.*, 149 Kan. at 460.

The citation from the *Caterpillar Tractor Co.* court refers to the Ruling Case Law, a treatise that was the precursor to the American Jurisprudence series. Interestingly, the portion of the R.C.L. quoted in the opinion is only the first half of the rule. The full quote states: "Assent may be indicated by conduct or acquiescence, unless such conduct does

21

not furnish a basis from which an intention to assent may be inferred." See 6 R.C.L., Contracts § 22. But in any event, the takeaway from *Caterpillar Tractor Co.* is that exceptions exist under Kansas law to the general rule that silence does not equate to assent. Stated another way, Equity Bank persuasively argues the district court erred to the extent it based its ruling finding Knisley's silence did not equal assent on a categorical rule requiring an "affirmative statement" of assent from Knisley.

But while such exceptions may be "rare," the rarity of an exception does not dictate whether it applies. See, e.g., Restatement (Second) of Contracts § 19 comment a (1981) ("Purely negative conduct is sometimes, though not usually, a sufficient manifestation of assent. See § 69."); Restatement (Second) of Contracts § 30 comment e (1981) ("Sometimes, though not ordinarily, even silent inaction may be effective as a mode of acceptance."); Restatement (Second) of Contracts § 69, comment a (1981) ("Acceptance by silence is exceptional."). As both parties recognize, the three enumerated instances where an offeree's silence can manifest their assent are:

> "(a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.
> "(b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.
> "(c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." Restatement (Second) of Contracts § 69(1)(a)-(c) (1981).

See also 17A Am. Jur. 2d, Contracts § 97 (cross-referencing § 69); *Foodbrands Supply Chain Servs., Inc. v. Terracon, Inc.*, No. Civ.A. 02-2504-CM, 2004 WL 955989, at *6 (D. Kan. 2004) (recognizing provisions as "consistent with Kansas law and with generally recognized principles of contract law").

22

As best as can be understood, Equity Bank's argument for applying each of the three exceptions is built on a faulty assumption that Knisley's acceptance of the Arbitration Agreement was explicitly conditioned on continued use of the account. Equity Bank insists the plain language of the "effective date" terms in the Arbitration Agreement informed Knisley that continued use of her account without opting out meant agreeing to arbitration, but that assertion is simply incorrect. The Arbitration Agreement specifically stated: "You can opt out of the Arbitration Provision as provided below and you will not lose any of the rights and benefits of your accounts," and also gave Knisley "the right to opt-out of this Arbitration Agreement [which] will not affect any other terms and conditions of your relationship with us." In other words, the Arbitration Agreement unambiguously allowed Knisley to continue using her account even if she had taken affirmative steps to opt out of the Arbitration Agreement.

Restatement (Second) of Contracts § 69(1)(a) addresses the circumstances that were present in *Caterpillar Tractor Co.*, because in that case the Kansas Supreme Court expressly held that the lessor agreed to modify a lease agreement by silently accepting the benefits of the lessees' continued work on the farmland in question. 149 Kan. at 460. Other than blanket assertions without support, Equity Bank fails to explain what "benefits" Knisley accepted to reflect her assent to the Arbitration Agreement. And there is also nothing in the record to suggest that Knisley took any purported benefits related to accepting the Arbitration Agreement, such as by initiating an arbitration proceeding. See *Land v. IU Credit Union*, 218 N.E.3d 1282, 1290-91 (Ind. 2023). Although the parties focus on the arbitration provision, the fact that Knisley chose to file a class action after Equity Bank's purported amendment tends to show she did not intend to accept either the arbitration provision or the class-action waiver. As a result, we find the exception from subsection (1)(a) does not apply.

Restatement (Second) of Contracts § 69(1)(b) would apply when evaluating the terms of the opt-out clause, which the district court specified was analyzed in *Duling*. 63

Kan. App. 2d at 440-41. While we are not bound by *Duling*, since it addresses a nearly identical factual situation using principles of Kansas contract law, we believe its holdings are highly relevant. See *State v. Fleming*, 308 Kan. 689, 706, 423 P.3d 506 (2018) (noting one panel of this court is not bound by another panel of this court's decision).

As here, *Duling* involved determining whether a party's silence in response to an offer to add an arbitration agreement could constitute their assent. This court noted that under Kansas law, establishing a meeting of the minds requires terms that are "complete and definite enough that each party reasonably understands the rights and obligations created." 63 Kan. App. 2d at 440 (citing *Jack Richards Aircraft Sales, Inc. v. Vaughn*, 203 Kan. 967, 971, 457 P.2d 691 [1969]); see also *Wachter Mgmt. Co. v. Dexter*, 282 Kan. 365, 377, 144 P.3d 747 (2006) ("'The offeror, whether the seller or the buyer, is the master of the offer.'"). This court then recognized that "[f]ailure to opt-out of an arbitration program can, of course, constitute acceptance." *Duling*, 63 Kan. App. 2d at 443 (citing *Rittenhouse v. GlaxoSmithKline*, CV No. 21-1836, 2021 WL 6197361, at *3-4 [E.D. Pa. 2021]). This court also explained that "acceptance is measured not by the parties' subjective intent, but by their outward expressions of assent," and therefore "an offer with clearer and more specific terms provides a better basis from which we may find an outward expression of assent and thus a binding contract." *Duling*, 63 Kan. App. 2d at 443. Because the language explaining the opt-out date was ambiguous, this court found the bank could not rely on the plaintiff's failure to opt out and continued use of the account to infer assent to the arbitration agreement. 63 Kan. App. 2d at 444-46.

In contrast, the district court here found the Arbitration Agreement was "'clear and specific' as described in *Duling*." The Arbitration Agreement explained that it became "effective upon the 31st day after we provide it to you . . . unless you opt-out in accordance with the requirements of the RIGHT TO OPT-OUT provision." Although Knisley claims she does not recall receiving or viewing the April 2021 Email, the district court found no evidence in the record to support this contention. We must defer to that

24

factual finding and therefore find the Arbitration Agreement would become effective 31 days later unless Knisley chose to opt out by sending either a letter or email to Equity Bank stating: "'I elect to opt out of the Arbitration Agreement' or any words to that effect." The district court found Knisley "did not respond in any affirmative manner. She was silent."

Yet, the district court was "not persuaded that such a clause is sufficient to indicate assent under these circumstances" because "the idea that [Equity Bank] can offer any type of new contract provision and simply add an opt out clause can be taken too far, as it has been here." The district court does not explain how the "clear and specific" terms of the opt-out clause went "too far," but *Duling* also does not require this court to find in Equity Bank's favor simply because the opt-out procedures here were more specific. As the Restatement recognizes, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." Restatement (Second) of Contracts § 69, comment c. Thus, Equity Bank still needed to show Knisley *intended to accept* the Arbitration Agreement through her silence, which it failed to do. Other than Knisley's continued use of her account—which was not explicitly stated to be conditioned on accepting the Arbitration Agreement— Equity Bank provides no additional facts to show Knisley intended to accept the offer. As a result, the exception from Restatement (Second) of Contracts § 69(1)(b) also does not apply.

Lastly, Restatement (Second) of Contracts § 69(1)(c) addresses the prior course of dealing between the parties to an agreement, which the district court in this case noted was present but found it inapplicable. See *Morgan v. Morgan*, No. 74,828, 1996 WL 35070475, at *1 (Kan. App. 1996) (unpublished opinion) ("Plaintiffs have shown no previous dealings as mentioned by the Restatement, and the letter they rely on simply refers to the possibility of questions about their proposal."). In particular, the district court explained that

25

"allowing that course of dealing to equal assent to the newly proposed contract by Equity [Bank] would nullify the Court's analysis above, and, in effect, allow 'change' to include 'add', a benefit to Equity [Bank] that the Court is unwilling to grant. See *Locklear Automotive Group, Inc. v. Hubbard*, 252 So.3d 67, 85 (Ala. 2017) (assent to arbitrate typically manifested by signing the contract containing an arbitration provision)."

For this exception, Equity Bank's argument seems to be that a reasonable person would understand that Equity Bank would only continue to offer services if she assented to the terms of Arbitration Agreement. But again, continued account use was not explicitly conditioned on acceptance, as Equity Bank repeatedly insists. Moreover, Equity Bank provides nothing to show that the parties' previous course of dealing involved other attempts by Equity Bank to add terms to the Agreement. Thus, it cannot be said that it would be reasonable to infer Knisley's assent through her failure to notify Equity Bank she did not intend to accept its offer to add the Arbitration Agreement.

*Does the Federal Arbitration Act preempt the district court's application of Kansas contract law?*

For its final argument, Equity Bank argues the district court's ruling applying state law is preempted by federal law, particularly the Federal Arbitration Act. According to Equity Bank, the district court's conclusion that the State needed to prove Knisley made an "affirmative statement" accepting the Arbitration Agreement impermissibly disfavors arbitration because it places a "heightened" requirement on formation of arbitration agreements.

Equity Bank asserts the district court's ruling violates the so-called "equal-footing principle." As it notes, the Supreme Court held in *Kindred Nursing Centers. Ltd Partnership v. Clark*, 581 U.S. 246, 248, 137 S. Ct. 1421, 197 L. Ed. 2d 806 (2017), that 9 U.S.C. § 2 requires courts to "place arbitration agreements 'on equal footing with all other contracts'" (quoting *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54, 136 S. Ct. 463,

193 L. Ed. 2d 365 [2015]). Stated another way, "[a] rule selectively finding arbitration contracts invalid because improperly formed fares no better under the Act than a rule selectively refusing to enforce those agreements once properly made." *Kindred Nursing Centers. Ltd Partnership*, 581 U.S. at 254-55. But *Kindred Nursing Centers. Ltd Partnership* merely clarified that the equal-footing principle prohibits state laws about contract formation that *also* discriminate against arbitration. 581 U.S. at 251. Thus, contrary to Equity Bank's claims in its reply brief, *Kindred Nursing Centers. Ltd Partnership* does not control the outcome here because the threshold determination of whether an agreement to arbitrate existed is still governed by ordinary state-law principles of contract formation.

Equity Bank's strongest argument for federal preemption is that the district court tacitly relied on *Badie v. Bank of America*, 67 Cal. App. 4th 779, 796 (1998), which other courts have criticized as being overly hostile toward arbitration. But any reliance by the district court on *Badie* is immaterial since we rely on Kansas law, so that decision did not factor heavily into our analysis. Moreover, the best Equity Bank can assert to show the district court's hostility is that it stated Equity Bank had "taken" its power to amend the contract "too far," and deemed the power to add an arbitration clause as only being a "benefit" to Equity Bank. Equity Bank mischaracterizes these isolated statements by the district court, and they are in no way overtly hostile to arbitration as a whole. Put simply, Equity Bank does not provide a persuasive argument that any part of the district court's ruling was based in hostility to arbitration.

CONCLUSION

In sum, we affirm the district court's ruling denying a motion to compel arbitration. The plain meaning of the change-in-terms clause of Knisley's accountholder Agreement only authorized Equity Bank to change existing terms. Because the Agreement contained no dispute resolution procedures, Equity Bank could not rely on the

change-in-terms clause to add an arbitration requirement. Even treating Equity Bank's proposed amendment as a new offer, Equity Bank fails to show that Knisley assented to the Arbitration Agreement. Kansas law recognizes exceptions to the general rule that silence in response to an offer is not assent, but Equity Bank fails to show that any recognized exceptions applied. Lastly, Equity Bank fails to show the district court's ruling is preempted by federal law.

Affirmed.