No. 59,815

LLOYD D. RICHARDSON and VIOLET M. RICHARDSON, husband and wife; EDWARD R. TOOTHMAN and ELIZABETH B. TOOTHMAN, husband and wife; and DONALD E. TOOTHMAN and ROBERTA M. TOOTHMAN, husband and wife, *Appellees,* v. NORTHWEST CENTRAL PIPELINE CORPORATION, n/k/a WILLIAMS NATURAL GAS COMPANY, *Appellant.*

(740 P.2d 1083)

Opinion filed July 17, 1987.

Charles T. Engel, of Cosgrove, Webb & Oman, of Topeka, argued the cause, and James L. Grimes, Jr., of the same firm, and J. D. Steelman, of Tulsa, Oklahoma, were with him on the brief for appellant.

H. Lee McGuire, of Davis, McGuire & Thompson, Chartered, of Leavenworth, argued the cause, and Jeff C. Spahn, Jr., of Martin, Pringle, Oliver, Wallace & Swartz, of Wichita, was on the brief for appellees.

The opinion of the court was delivered by

HERD, J.: This is a direct appeal from a district court order granting appellees' motion for summary judgment. Appellant contends, inter alia, that genuine issues of material fact precluded such a decision, and that appellant's own motion for summary judgment should have prevailed.

On January 11, 1951, Nettie Kessinger, a widow; her three sons Calvin, a widower, Henry, and Harold; and their respective wives, Mary and Viola, entered into a gas storage lease with Cities Service Gas Company. The lease covered 366 acres of land in Leavenworth County, Kansas, described as follows:

"Northwest Quarter and the West Half of the Southwest Quarter of Section 1, and South Half of the Northeast Quarter and the Northwest Quarter of the Northeast Quarter of Section 2, Township 10 South, Range 20 East."

Northwest Central Pipeline Corporation, defendant- appellant herein, is the successor in interest to the interest owned by Cities Service Gas Company in the lease.

Pursuant to the terms of the lease, the Kessingers were to receive annual rental payments of $1.00 per acre, a total of $366.00, to cover storage costs. The lease was for a primary term of ten years, and so long thereafter as Cities Service used lands in the vicinity for gas storage purposes.

When the lease was executed there was no dwelling located on the leased land, yet the lease contained a provision for the landowner's domestic use of natural gas produced or stored on the premises.

On January 15, 1952, Nettie Kessinger, sons Calvin and Harold, and Harold's wife, Viola, conveyed title to the West Half of the Southwest Quarter of Section 1, Township 10 South,

Range 20 East in Leavenworth County, to Henry and Mary Kessinger.

On July 25, 1962, more than ten years later, Henry and Mary Kessinger sold the West Half of the Southwest Quarter of Section 1 to William F. and Eleanor H. Nussbaum.

The first dwelling located on the West Half of the Southwest Quarter was erected in 1962.

On March 29, 1973, the Nussbaums conveyed the West Half of the Southwest Quarter to appellees Edward and Elizabeth Toothman. The Toothmans subsequently subdivided the West Half of the Southwest Quarter by selling tracts to the following:

1. Mr. and Mrs. Harold Hall, who then conveyed title to Mr. and Mrs. Dale Hummelgaard;
2. Mr. and Mrs. J. C. Harbord;
3. Mr. and Mrs. Lloyd Richardson, appellees;
4. Mr. and Mrs. Donald Toothman, appellees.

The dwelling occupied by appellees Edward and Elizabeth Toothman was erected in 1962. The dwelling occupied by appellees Donald and Roberta Toothman was erected in 1973-74. The dwelling occupied by appellees Lloyd and Violet Richardson was erected in 1975-76. The land upon which the appellees' dwellings stand is subject to the lease.

Northwest Central and its predecessor, Cities Service, injected gas into the storage reservoir as authorized by the lease, the leased land being used for gas storage purposes.

Paragraphs 5 and 6 of the lease control this controversy. They provide:

"5. In the event there was on June 23, 1944, a producing gas well or wells on the above described lands First Party shall have annually, in lieu of gas to which he may be entitled under any oil and gas lease, not to exceed Three Hundred Thousand cubic feet of the gas free of cost, but only from wells on said premises until Second Party begins the actual injection of gas for storage purposes into McLouth Field, while such well or wells are capable of producing such gas, *for domestic use at the principal dwelling house on said lands*, by making his own connections with the well at his own risk and expense and while he is maintaining all service lines, connections and equipment in a manner to prevent leakage of gas therefrom. Second Party may at its option deliver such free gas at a convenient point on its then nearest pipeline on or in the vicinity of said lands instead of at the well. However, Second Party agrees that if during the term of this lease First Party uses in any one year an amount of gas in excess of Three Hundred Thousand cubic feet, Second Party will sell or cause to be sold to First

Party such excess gas at a price of fifty cents (50¢) per thousand cubic feet. Measurement and delivery of gas shall be at Second Party's meter, calculated according to the regular measuring and accounting procedure and rules and regulations of [S]econd [P]arty pertaining to sale of gas. First Party agrees to pay for such gas so sold to him during any month by the tenth of the next succeeding month, and in the event of failure to do so delivery of gas may be suspended until the amount due Second Party from First Party has been paid in full or until sufficient time shall elapse to satisfy such arrearage by application of future amounts of free gas to which First Party would be entitled hereunder.

"6. After Second Party has begun the actual injection of gas as aforesaid and in the event there was not on June 23, 1944 a producing gas well on the above described lands, Second Party, upon written request of First Party for gas, addressed to its Oklahoma City, Oklahoma office, shall within thirty (30) days after receipt of such request set or cause to be set a meter at its then nearest pipeline in a suitable place near to or in the vicinity of said lands, and when First Party, at his own cost and risk, has connected thereto, shall sell or cause to be sold during the term of this lease at it s [sic] such pipeline, gas *for domestic use on said lands* at a price of fifty cents (50¢) per thousand cubic feet. Measurement and delivery of gas shall be at Second Party's meter, calculated according to the regular measuring and accounting procedure and rules and regulations of Second Party pertaining to the sale of gas. First Party agrees to pay for such gas sold to him during any month by the tenth of the next succeeding month and in the event of failure to do so delivery of any gas may be discontinued until the amount due Second Party from First Party has been paid in full.

"*The provisions of this clause (6) shall remain in force and effect until such time as a well capable of delivering gas has been completed by Second Party on the above described lands. If, as and when such a well is completed on said lands, First Party may at his option avail himself of the provisions of Clause Five (5) of this lease.*" (Emphasis added.)

There has been no production of natural gas on the premises during the term of the lease. Thus, the free gas provision in paragraph 5 is inapplicable.

On January 25, 1984, Northwest Central granted J. C. Harbord's written application to connect to its natural gas pipeline and to receive gas for domestic use at the Harbord residence at the rate of 50¢ per 1,000 cubic feet (cheap gas). Thereafter, appellant set a meter on its pipeline in the East Half of the Southwest Quarter of Section 1.

Between February and September 1984, appellees requested connection to Northwest Central's pipeline and applied for gas for domestic use at their residences. Northwest Central denied appellees' request on the ground the parties to the lease did not agree to provide cheap gas to other than the principal dwelling

located on the leased land. Northwest Central contended the cheap gas provision was honored by providing cheap gas to the J. C. Harbord residence.

Thereafter, appellees filed suit on September 6, 1985, seeking: (1) a declaratory judgment determining whether Northwest Central was obligated under the terms of the lease to provide them with cheap gas; (2) damages from being forced to seek and use alternative and more expensive forms of energy, and (3) cancellation of the gas storage lease so far as it pertains to land owned by appellees.

On March 19, 1986, appellees filed a motion for summary judgment pursuant to K.S.A. 60-256, asserting that there were no genuine issues of material fact and they were entitled to judgment as a matter of law.

On May 12, 1986, appellant filed a motion for summary judgment under K.S.A. 60-256, alleging that there were no issues of material fact and it was entitled to judgment as a matter of law.

On June 24, 1986, the district court sustained appellees' motion for summary judgment, determining the appellees were entitled to cheap gas from Northwest Central. In the alternative, the court found that appellees were entitled to cancellation of the lease.

Northwest Central appealed.

The first issue is whether genuine issues of material fact remain, precluding appellees' motion for summary judgment.

We have held summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Peoples Nat'l Bank & Trust v. Excel Corp.*, 236 Kan. 687, Syl. ¶ 5, 695 P.2d 444 (1985); *Lostutter v. Estate of Larkin*, 235 Kan. 154, 164, 679 P.2d 181 (1984). When summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. *Hollingsworth v. Fehrs Equip. Co.*, 240 Kan. 398, 401, 729 P.2d 1214 (1986); *Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 238 Kan. 384, Syl. ¶ 2, 710 P.2d 1297 (1985). Here, both parties filed motions for summary judgment. Thus,

neither party has a more favored position in and consideration of the record.

Northwest Central contends on appeal that there were genuine issues of material fact which precluded the granting of summary judgment for the appellees. The issues of material fact, Northwest Central contends, were:

1. whether appellant breached its obligation under the lease;
2. whether the original parties to the lease intended to include service of free or cheap gas at more than the principal dwelling on the leased land; and
3. whether the Cities Service Gas Company intended paragraphs 5 and 6 of the lease to be essential parts of the lease.

In *Jackson v. Farmer*, 225 Kan. 732, 739, 594 P.2d 177 (1979), we recited the rules governing oil and gas leases, as follows:

"Among the familiar rules governing the construction of oil and gas leases are these: the intent of the parties is the primary question; meaning should be ascertained by examining the document from all four corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision; reasonable rather than unreasonable interpretations are favored; a practical and equitable construction must be given to ambiguous terms; and any ambiguities in a lease should be construed in favor of the lessor and against the lessee, since it is the lessee who usually provides the lease form or dictates the terms thereof."

See *Adolph v. Stearns*, 235 Kan. 622, 627, 684 P.2d 372 (1984); *Rook v. James E. Russell Petroleum, Inc.*, 235 Kan. 6, Syl. ¶ 1, 679 P.2d 158 (1984); *A & M·Oil, Inc. v. Miller*, 11 Kan. App. 2d 152, 154, 715 P.2d 1295 (1986).

Thus, the initial question for our determination is whether the agreement in question is ambiguous. Both parties to this appeal contend the agreement is unambiguous; however, not surprisingly, each side would interpret the contract differently.

The appellant would construe paragraphs 5 and 6 of the contract in such a way that only the owner of the principal dwelling house is entitled to receive free or cheap gas. Appellant contends the primary difference between the two paragraphs is that paragraph 5 permits the owner of the principal dwelling house to connect with a *producing gas well* located on the subject property, while under paragraph 6, the owner of the principal dwelling may connect with the lessor's *nearest pipeline,* where there are no producing wells located on the land.

Appellees, on the other hand, concede that while paragraph 5 provides for the delivery of free or cheap gas from a producing well to the principal dwelling house, paragraph 6 contains no such restriction. Instead, appellees point out that paragraph 6 requires the appellant to supply natural gas "for domestic use on said lands." Thus, appellees reason appellant is obligated to supply gas to all of the appellees, who are the current occupants of the subject property. Under such an analysis, it follows that Northwest Central would be required to supply cheap gas not only to the appellees but to *all* future occupants of said land, however numerous they may be.

We have held the language in a contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in the sense that the contract may be understood to reach two or more possible meanings. *Stauth v. Brown,* 241 Kan. 1, Syl. ¶ 6, 734 P.2d 1063 (1987). Despite the parties' contentions to the contrary, we find the lease is clearly ambiguous as to which parties are entitled to receive free or cheap gas. Depending upon how the agreement is interpreted, it could require the lessor to provide free or cheap gas to any number of purchasers. However, it could also be interpreted to mean that only the owner of the principal dwelling house is entitled to free or cheap gas for domestic use.

We have held that where ambiguity or uncertainty of contract is involved in an agreement, the intention of the parties is not ascertained by resort to literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties. *Amortibanc Investment Co. v. Jehan,* 220 Kan. 33, Syl. ¶ 2, 551 P.2d 918 (1976).

With this rule in mind, we now turn to the lease which is the source of this controversy. This lease is a combination oil and gas production lease and a gas storage lease. It contains a primary term with annual rental payments and a "so long thereafter" clause dependent upon the lessee's continued storage of gas in the area and payment of the annual rental.

Paragraph 5 of the lease is a provision pertaining to the production of gas on the premises. It provides that the lessor is

entitled to 300,000 c.f. of free gas annually "for domestic use at the principal dwelling house on said lands." This is the landlord's share of the gas production. Paragraph 5 further provides after the lessor has received its share of free gas, lessor may purchase additional cheap gas at 50¢ per thousand cubic feet. This paragraph sets out the parties' scheme.

Paragraph 6 pertains to the lessor's rights in the event there was no producing gas well on the premises on June 23, 1944, and lessee has begun the actual injection of gas into the storage horizon. This paragraph continues the same scheme as in paragraph 5 except it omits the free gas provision. This is logical, since the landowner has no landlord's share of the stored gas. It gives the landowner the right to buy cheap gas (50¢ per thousand cubic feet) upon the same terms and conditions as set out in paragraph 5, "for domestic use on said lands." The words "principal dwelling house" are omitted.

The question, then, is whether the omission in paragraph 6 of the words "principal dwelling house" means that lessee is agreeing to furnish cheap gas for domestic purposes to any number of purchasers in case of subdivision of the land. There are 366 acres in the leased acreage. Thus, it could be platted for urban development and could contain in excess of 100 homes if fully developed.

Free gas and cheap gas clauses are comparable provisions in oil and gas leases. Each provides additional benefits to the lessor in addition to the rental payment as a part of the consideration for the lease. 3A Summers, Oil & Gas § 587, p. 89 (2d ed. 1958). Also, such provisions are deemed covenants running with the land unless the covenant is specifically with a named individual. See 3A Summers, Oil & Gas § 587, p. 97-100; 3 Williams, Oil & Gas Law § 661.2, p. 757 (1986). Here, the free gas and cheap gas covenants ran with the land under the provision that the lease "shall extend to and be binding upon the heirs, devisees, executors, administrators, personal representatives, successors and assigns of the parties hereto."

Generally, the free gas or cheap gas clause contains the restriction "for domestic use at the principal dwelling house" or similar terminology; never is it unlimited, as such would be economically unfeasible. 3 Williams, Oil & Gas Law § 661.

Thus, it is incredulous to believe that in this case, the lessee would covenant to provide stored gas at its cost or less to an unlimited number of assigns of lessor. At the time the lease was executed, there was no dwelling on the premises. Thus, there was no demand for free or cheap gas. In determining the intent of the parties, we deem this a significant fact. In spite of that, the parties agreed to the free gas and cheap gas covenants. In paragraph 5, 300,000 cubic feet of free gas is to be furnished lessor for domestic use at the principal dwelling house and if lessor uses more than that amount, he is required to pay 50¢ per thousand cubic feet for the excess gas. When the lease discusses the sale of the excess gas it does not repeat the restrictions on use, but there can be no doubt the "domestic use at the principal dwelling" restriction is applicable to both free gas and cheap gas referred to in paragraph 5.

Paragraph 6 continues the provisions of paragraph 5 but refers to lessor's benefits under the gas storage lease as distinguished from the gas production lease. Here, it provides if there is no production, the lessor may still receive the benefit of the cheap gas purchase privilege for domestic purposes on the land previously described in paragraph 5 by notifying lessee and setting a meter at his own cost and risk. It should be noted the lease provides for the setting of "a meter." Multiple users would require the use of more than one meter.

We conclude it is clear from the lease and circumstances surrounding its execution that the parties' intention was to furnish free gas and cheap gas to the lessors for domestic use only at the principal dwelling house on the premises. We hold that while the covenant runs with the land, it obligates the lessee to provide benefit for only one assignee of lessor. Thus, the present owner of lessor's principal dwelling is entitled to the cheap gas.

The judgment of the trial court is reversed and this case is remanded with directions to enter judgment for appellant.

McFARLAND, J., concurring in part and dissenting in part: I concur with the majority's conclusion that the contract is ambiguous. I disagree with the majority's conclusion that the intention of the parties can be determined without affording the parties the

opportunity to present parol and other extrinsic evidence relative thereto.

It is true all parties sought summary judgment and in so doing alleged that the contract was not ambiguous. This is not binding upon either the district court or an appellate court. The majority opinion has correctly held the contract is ambiguous. The district court sustained the plaintiff landowners' motion for summary judgment. The majority opinion reverses this determination and, in effect, sustains defendant pipeline company's motion for summary judgment. If ever a question of contractual interpretation cried out for parol or extrinsic evidence to explain the parties' intentions, this one does. Consider the following:

1. None of the parties hereto are the original parties to the contract.

2. The crucial date in paragraphs 5 and 6 is June 23, 1944, but no party has any explanation of the significance of that date (the contract was executed on January 11, 1951).

3. Paragraph 7 of the contract provides:

"There now exists on the lands described in this lease no producing gas well and for the purposes of this contract the parties have taken measures to ascertain and calculate the amount of gas underlying the premises involved and do hereby agree that there was on June 23, 1944 no cubic feet there, computed on a basis of two (2) pounds per square inch above an agreed atmospheric pressure of 14.4 pounds."

4. The contract is wholly typewritten and is not a fill-in-the blanks form contract which frequently results in apparent confusing and conflicting language.

5. The pipeline company has stored and continues to store gas on the leased premises. No well capable of delivering gas has been completed by "the pipeline company." Hence the option created in the final sentence of paragraph 6 to apply paragraph 5 is not available—yet paragraph 5 contains the only reference to the supplying of gas to the "principal dwelling house." In fact this "principal dwelling house" phrase relates wholly to supplying free gas in lieu of free gas to which the First Party would be entitled to under some gas lease which is and was nonexistent. The only cheap gas mentioned in paragraph 5 is gas used in excess of the 300,000 cubic feet of free gas, but there has never been any free gas.

6. There is simply no way to determine from examining the

contract to determine just what was intended by the parties by their inclusion of the language contained in paragraphs 5 and 6.

I would reverse and remand the case for further proceedings. The contract has been found to be ambiguous. Parol and other extrinsic evidence should be admitted as to the intention of the parties and the usual custom and practice of the industry. The intention of the parties should be determined by a trier of facts—not by a district court on summary judgment, or by this court on appellate review of the entry of summary judgment.

LOCKETT, J., joins the foregoing dissenting opinion.