NOT DESIGNATED FOR PUBLICATION

No. 127,158

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RICHARD C. SMOOTS and DEBBY D. SMOOTS,
*Appellants*,

v.

SOUTHERN STAR CENTRAL GAS PIPELINE, INC.
and
JONATHON BOESE,
*Appellees*.

MEMORANDUM OPINION

Appeal from Jefferson District Court; CHRISTOPHER ETZEL, judge. Oral argument held March 11, 2025. Opinion filed February 6, 2026. Affirmed.

*Benjamin K. Carmichael*, of Morris Laing Law Firm, of Wichita, for appellants.

*Samantha M.H. Woods*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee Southern Star Central Gas Pipeline, Inc.

No appearance by appellee Jonathon Boese.

Before ATCHESON, P.J., COBLE and PICKERING, JJ.

PICKERING, J.:  The "principal dwelling" clause under a gas storage lease executed in 1950 is the focus of the dispute between Richard C. and Debby D. Smoots and Southern Star Central Gas Pipeline, Inc. and Jonathon Boese.

1

The Smootses appeal the district court's grant of summary judgment, which found Boese resided in the lease's principal dwelling and ruled that Southern Star properly honored its obligation under the lease by providing free gas to Boese. After reviewing the record, we find summary judgment was appropriate. The district court also did not err in citing an affidavit that attested to nonmaterial facts, nor did the district court err in ruling that a 1969 agreement did not modify the 1950 lease as to remove the principal dwelling requirement to receive free gas. We therefore affirm the district court's granting of the summary judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 1950, Besse and Alfred McLeod entered a gas storage lease with Cities Service Gas Company, allowing Cities Service Gas to store gas on the McLeods' 88.4-acre property. Paragraph 5 of the lease provided for a certain amount of free gas to the principal dwelling on the lease property:

"In the event there was on June 23, 1944 a producing gas well or wells on the above described lands First Party shall have annually, in lieu of gas to which he may be entitled under any oil and gas lease, not to exceed Three Hundred Thousand cubic feet of gas free of cost, but only from wells on said premises until Second Party begins the actual injection of gas for storage purposes into said McLouth Field, while such well or wells are capable of producing such gas, for domestic use at the principal dwelling house on said lands, by making his own connections with the well at his own risk and expense and while he is maintaining all service lines, connections and equipment in a manner to prevent leakage of gas therefrom. Second Party may at its option deliver such free gas at a convenient point on its then nearest pipeline on or in the vicinity of said lands instead of at the well. However, Second Party agrees that if during the term of this lease First Party uses in any one year an amount of gas in excess of Three Hundred Thousand cubic feet, Second Party will sell or cause to be sold to First Party such excess gas at a price of fifty cents (50₵) per thousand cubic feet. . . ."

Paragraph 6 of the lease outlined the procedure for requesting free gas under certain circumstances:

"After Second Party has begun the actual injection of gas as aforesaid and in the event there was not on June 23, 1944 a producing gas well on the above described lands, Second Party, upon written request of First Party for gas, addressed to its Oklahoma City, Oklahoma office, shall within thirty (30) days after receipt of such request set or cause to be set a meter at its then nearest pipeline in a suitable place near to or in the vicinity of said lands, and when First Party, at his own cost and risk, has connected thereto, shall sell or cause to be sold during the term of this lease at its such pipeline, gas for domestic use on said lands at a price of fifty cents (50¢) per thousand cubic feet. . . .

"The provisions of this clause (6) shall remain in force and effect until such time as a well capable of delivering gas has been completed by Second Party on the above described lands. If, as and when such a well is completed on said lands, First Party may at his option avail himself of the provisions of Clause Five (5) of this lease."

At the time of the lease execution, the lease property contained two producing gas wells. On the same day the parties executed this lease, they also executed a second gas storage lease covering the McLeods' separate 252.17-acre property. The second lease also granted 300,000 cubic feet of free gas for domestic purposes on the second lease property.

In 1963, upon written request by Alfred McLeod, Cities Service Gas began providing free gas to the principal dwelling on the lease property. Then, "in or around 1963," the McLeods subdivided the lease property into four tracts.

In 1964, the McLeods and Cities Service Gas executed an agreement transferring the free gas obligation in the first lease to the second lease property. Under this agreement, Cities Service Gas provided 600,000 cubic feet of free gas to the second lease

3

property. Paragraph 3 of the 1964 agreement stated: "Except as herein modified, said First Lease and said Second Lease shall remain as written."

However, in 1969, the McLeods and Cities Service Gas entered into another agreement transferring the 300,000 cubic feet of free gas originally provided in the first lease back to the first lease property.

*Successor in Interest, Lease Tract Sale, and Requests for Free Gas*

Under the terms of the first lease, Southern Star became the successor in interest to Cities Service Gas. Under Paragraph 15 of the lease, all of the lease's terms and conditions extended to and were binding upon "the heirs, devisees, executors, administrators, personal representatives, successors and assigns of the parties hereto."

In 1982, the McLeods sold one of the four tracts of the first lease—and thus subject to the 1950 gas storage lease—to David and Mary Rollins. This tract was vacant at the time, and there was no longer a dwelling where the McLeods originally connected to the gas well for free gas. Later that year, Southern Star granted the Rollinses' written request for free gas for their trailer. The Rollinses' trailer was the only dwelling on the entire lease property.

In 1988, the Rollinses sold their tract to the Smootses. By this time, the Rollinses' trailer was no longer on the tract. There were no other dwellings on the other three tracts of the lease property either. Even without a dwelling, the tract the Smootses purchased included "the water lines, septic system, transformer pole, electric meter, and the gas lines" where the trailer had been located.

*Hills' Interest in the Right to Free Gas Under the Lease*

In or around 1991, Carla Hill—an owner of another tract of the property subject to the gas lease—called Richard to ask if the Smootses would forfeit their gas right. Richard denied the Hills' request, informing Hill that he "had plans to build on the property" and would not relinquish the gas right.

In 1999, the Hills submitted a written request to Southern Star for free gas after establishing a dwelling on their tract. Their dwelling was the only residence on any tracts of the lease property. Southern Star granted the request, deeming the Hills' dwelling the principal dwelling under the lease. The Smootses were unaware that Southern Star granted the Hills' request. The Hills later sold their tract to Boese. Boese then resided in the dwelling on the tract.

The Smootses built a barn on their tract in approximately 2012. They "[s]tarted the process" of building a residence on their tract in February 2021; construction began in September 2021. Richard submitted a written request to Southern Star for free gas in February 2021. Richard was not aware that Southern Star had been providing free gas to the Hills. Two months later, Southern Star explained that because it was already providing free gas to another lease property owner, it was denying Richard's request.

*The Smootses File a Petition Against Southern Star and Boese*

In 2022, the Smootses filed a petition against Southern Star and Boese for breach of contract, unjust enrichment, and declaratory judgment. The Smootses sought declaratory judgments that: (1) they "were first to establish the right to require the installation of a meter and to receive lease gas under the provisions of Lease, including but not limited to paragraph 6 thereof"; (2) their "rights to require the installation of a meter and to receive lease gas are not prejudiced or undermined in any way by Southern

5

Star's subsequent installation of a meter and provision of lease gas to the dwelling at the Hill Property"; and (3) they "still have the contractual right to demand and require the installation of a meter and to receive lease gas under the provisions of [the] Lease, . . . notwithstanding Southern Star's provision of lease gas to the Hill Property or any other property in or on the Lease Property."

Southern Star moved for summary judgment, arguing that establishing the principal dwelling on the lease property was a condition to receive free gas. Because no dwellings existed on the lease property when the Hills established the principal dwelling in 1999, Southern Star contended that Boese was entitled to free gas under the lease.

To its motion for summary judgment, Southern Star attached an affidavit by Rhonda Thompson, a senior land representative for Southern Star, as an exhibit. Thompson attested that she had served as a senior land representative and had "extensive knowledge regarding [Southern Star's] contractual obligations under the 1950 Gas Storage Lease . . . subject to this lawsuit." In relevant part, Thompson averred that the Hills submitted a written request for free gas in 1999, which Southern Star granted as the Hills owned the only dwelling on the lease property at the time.

The Smootses filed a cross-motion for partial summary judgment and response to Southern Star's summary judgment motion. They argued that the 1969 agreement—which transferred the free gas right from the McLeods' second property back to their first property and did not include a principal dwelling requirement—amended the original 1950 lease by removing the principal dwelling requirement. Because the Rollinses previously used the free gas on the Smootses' tract, the Smootses claimed they received a "first-in-time first-in-right Lease Gas right" as "part of their bundle of property rights." The Rollinses' prior establishment of the principal dwelling on their tract meant the free gas right stayed with that same tract and did not depend on maintaining a dwelling on the tract.

6

In their cross-motion, the Smootses objected to Thompson's affidavit as inadmissible. The Smootses contended that the affidavit was hearsay and lacked foundation because Thompson had no personal knowledge of the Hills' 1999 written request. The Smootses further claimed the written request was subject to the original writings rule and that Southern Star had not provided it in discovery.

As part of their exhibits to their cross-motion for partial summary judgment, the Smootses submitted an affidavit by Richard Smoots, claiming that when the Smootses bought their tract, Mary Rollins told Richard "that the property came with the free or reduced cost gas right." Richard asserted he "relied on [Mary's] representation" about the free gas right and "never abandoned" his intent to use the free gas. In response to an interrogatory, attached as an exhibit to Southern Star's summary judgment motion, the Smootses maintained Mary "was very adamant about the free gas right and its value . . . and it was part of the reason we purchased the property."

In its reply, Southern Star argued that Thompson had personal knowledge of the written request, "though not from the time of the request." Southern Star claimed the written request fell under the business records exception to hearsay. Southern Star also contended that, despite objecting to the affidavit, the Smootses did not dispute that the Hills requested free gas. The district court did not explicitly rule on the Thompson affidavit's admissibility, but the court cited the affidavit in its factual findings.

The district court rejected the Smootses' argument that the gas right remained with their tract, finding: "Since Ms. Rollins removed the trailer and ceased to use the lease gas sometime prior to 1988, the lease gas was available to be assigned to another 'principal dwelling house on said lands' as specified in the gas storage lease." The court also found that because the 1969 agreement left the 1950 lease unchanged except as expressly modified, the later agreement "only modified certain parts of the lease, but not the

7

'principal dwelling' portion of the lease." The district court thus granted Southern Star's summary judgment motion and denied the Smootses' partial summary judgment motion.

The Smootses now appeal the district court's granting of Southern Star's summary judgment motion.

ANALYSIS

*The District Court Did Not Err in Granting Southern Star's Motion for Summary Judgment*

On appeal, the Smootses challenge the terms of the first lease and its subject property. The Smootses raise three specific arguments relating to the district court granting Southern Star's summary judgment motion: (1) Rhonda Thompson's affidavit submitted by Southern Star was inadmissible; (2) a 1969 agreement did modify the 1950 lease as to remove the principal dwelling requirement for receiving free gas; and (3) they possess the property under a "first-in-time first-in-right" argument. The Smootses claim that the court erred in denying their right to free gas and finding for Southern Star.

*Standard of Review*

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law." *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019). "When summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment." *Richardson v. Northwest Central Pipeline Corp.*, 241 Kan. 752, 756, 740 P.2d 1083 (1987).

8

A. *There was no error in the district court's consideration of Rhonda Thompson's affidavit.*

The Smootses contend that Southern Star improperly submitted the Thompson affidavit. They argue the affidavit was inadmissible under the best evidence rule and, thus, there is "no admissible evidence to prove the [Hills'] written request in 1999 was ever made."

As noted above, Thompson's affidavit stated that the Hills submitted a written request to Southern Star for free gas in 1999. Before the district court's ruling, the Smootses challenged the affidavit's admissibility. While the district court did not explicitly rule on the affidavit's admissibility, the district court did reference the affidavit in its factual findings.

The Smootses argue that Southern Star never produced the Hills' 1999 written request for free gas referenced in Thompson's affidavit and is hearsay. Moreover, Hills' request was subject to the original writing rule, otherwise known as the best evidence rule. See K.S.A. 2024 Supp. 60-467(a). Southern Star attached the Hills' written request as an exhibit in a later filing, although it appears the letter was not an original writing.

In response, Southern Star argues that the admissibility of the Thompson affidavit is "a moot and inapplicable point." Southern Star contends that the affidavit's admissibility is irrelevant because the affidavit does not involve disputed issues of material fact. That is, because the Smootses do not dispute that the Hills requested free gas, this claim is immaterial. As to the Smootses' hearsay argument, Southern Star contends that the Hills' letter request falls under a business record exception to hearsay.

9

The Smootses disagree, asserting the Thompson affidavit is relevant "because it establishes the root of Boese's claim to the Lease Gas. In its absence, the court was relying on hearsay evidence in its determination."

In considering this claim, we begin with K.S.A. 2024 Supp. 60-256(e)(1), which states that "[i]f a paper or part of a paper is referred to in an affidavit or declaration, a sworn or certified copy must be attached to or served with the affidavit or declaration." The best evidence rule reads: "An original writing, recording or photograph is required in order to prove its content unless these rules or a statute provide otherwise." K.S.A. 2024 Supp. 60-467(a).

There is precedent in support of Southern Star's argument. Another panel of this court found objections to evidence on summary judgment unavailing where the objecting party failed to refute the material facts. *U.S. Bank NA v. McConnell*, 48 Kan. App. 2d 892, 905-06, 305 P.3d 1 (2013). Similarly, here, the submitted affidavit also relates to uncontroverted facts. In addition to Southern Star attaching the Hills' written request as an exhibit to its reply, the Smootses attached a request for Southern Star to admit that it "received a request to move the gas tap from its location on the Smoots property to the Boese property." Southern Star denied the admission request, acknowledging that it received a request to put a gas tap on the Boese property but claiming there was no active gas tap on the Smoots property at the time.

As the above demonstrates, other evidence showed the Hills requested free gas under the lease and the Smootses failed to controvert that fact. There is no issue about the Hills' 1999 request; thus, even if the district court's reliance on the affidavit was error, the Thompson affidavit does not involve disputed issues of material fact which would preclude summary judgment.

B.      *The district court did not err by finding the 1969 agreement did not amend the principal dwelling requirement in the gas storage lease.*

The parties dispute the extent to which the 1969 agreement modified the 1950 lease. The Smootses claim the 1969 agreement superseded paragraph 5 of the 1950 lease, removing the principal dwelling requirement. Southern Star contends the 1969 agreement only transferred the free gas right back to the McLeods' first property but left the rest of the 1950 lease intact.

As described previously, the 1950 lease provided free gas "for domestic use at the principal dwelling." In 1964, the original lease property owners, the McLeods, entered an agreement with Cities Service Gas transferring the free gas right in the 1950 lease to the McLeods' second property. But in 1969, the McLeods entered another agreement transferring the free gas provided in the 1950 lease back to the first property. The 1969 agreement provided for free gas as follows:

"3.      Company will furnish free of charge to the Owners of the First Tract from and after the execution and delivery of this agreement 300,000 cubic feet of gas annually for use for domestic purposes on such lands covered by said First Tract Lease under and subject to the terms and provisions of said First Tract Lease and this agreement. From and after the execution and delivery of this agreement, Company will furnish free of charge to the Owners of said Second Tract 300,000 cubic feet of gas annually for use for domestic purposes on such lands covered by said Second Tract Lease under and subject to the terms and provisions of said Second Tract Lease and this agreement.

"4.      If, during the terms of the First and Second Tract Leases, Owners use an amount of gas in excess of 300,000 cubic feet on either the First or Second Tracts, Owners agree to pay for such gas sold to them during any month by the tenth (10th) day of the next succeeding month, and in the event of failure to do so Company may suspend delivery of gas until the amount due Company has been paid in full or until sufficient

11

time shall elapse to satisfy such arrearage by application of future amounts of free gas to which Owners would be entitled under the terms of said First and Second Tract Leases, as amended by this agreement."

The 1969 agreement also provided: "Except as herein expressly modified, the said First Tract Lease and the said Second Tract Lease, hereinabove described, shall remain as written."

Other panels of this court have discussed subsequent agreements containing provisions like the 1969 agreement that left the original agreement as written except as expressly modified. See *Community First Nat'l Bank v. Nichols*, 56 Kan. App. 2d 1057, 1076, 443 P.3d 322 (2019); *Frontier Investment Banc Corp. v. Withers*, No. 122,659, 2021 WL 2483872, at *7 (Kan. App. 2021) (unpublished opinion).

In *Nichols*, the parties entered into agreements deferring payments on loans. The agreements stated: "'Except as specifically amended by this agreement, all other terms of the original obligation remain in effect.'" 56 Kan. App. 2d at 1060. Nichols claimed Community First breached the deferral agreements by allowing the loans to accrue interest. The *Nichols* panel found that, because the deferral agreements stated they were deferring payments while otherwise leaving the original loan terms in effect, interest accrual remained unaffected by the deferral agreements. 56 Kan. App. 2d at 1076.

Like *Nichols*, the 1969 agreement here provided that the 1950 lease remained in effect except as expressly modified. The 1969 agreement stated it was transferring the free gas right in the 1950 lease from the McLeods' second property back to the first property, thereby extinguishing the 1964 agreement that transferred the gas right to the second property. The 1969 agreement also provided that the lease property would receive 300,000 cubic feet of free gas "under and subject to the terms and provisions of said First Tract Lease and this agreement."

12

This language shows that, rather than completely superseding paragraph 5 of the 1950 lease—the provision containing the principal dwelling requirement—the purpose of the 1969 agreement was merely to transfer the free gas right back to the first property, still subject to the terms in the 1950 lease. Consequently, the 1969 agreement did not modify the 1950 lease to provide free gas to the lease property without any conditions.

### C. *The district court did not err in ruling the free gas right belonged to Boese.*

The Smootses' final claim challenges the district court's ruling that Boese is the party entitled to the right to free gas, as he is the present owner of the principal dwelling for the entire lease. This final claim asks us to determine the tract containing the "principal dwelling" as it relates to a free gas right, when the initial principal dwelling no longer exists. In other words, does the free gas right remain with the surface tract that previously contained the principal dwelling even if there is no present dwelling, or does that right belong to another lease tract that has established the sole dwelling on the lease property?

The Smootses argue that they possess the right to free gas under a "first-in-time first-in-right" argument. Under their theory, the right to free gas is "a personal right." They maintain the right remains with them because neither they nor the Rollinses transferred this right to another tract of the lease property.

Arguing against this position, Southern Star notes that the Smootses' interpretation of the lease would preclude the rest of the property from benefitting from the lease. Instead, Southern Star argues that the free gas right is a covenant running with the entire lease property, not just with the Smootses' tract. Within the entire lease property, the Boese property had housed the only dwelling on the entire lease property and, thus, is the principal dwelling. Southern Star contends that it correctly determined that the tract

presently owned by Boese, as the owner of the principal dwelling, was eligible for free gas.

In tackling this question, the district court considered and cited two Kansas cases: *Jackson v. Farmer*, 225 Kan. 732, 594 P.2d 177 (1979), and *Richardson*, 241 Kan. 752. These cases aid in our review.

*Jackson* involved four gas leases for four separate tracts owned by four people. All four leases provided free gas to the principal dwelling. At the time of the 1953 lease, no dwellings were on the tracts. Over 20 years later, in light of this lease term, the Farmers—owners of one of the leased tracts—built a residence and requested the gas well owner—Jackson—to connect their home to the gas well. Jackson refused. Undeterred, the Farmers began using free gas by laying a pipeline that connected their home to the well without Jackson's consent. Discovering the connection, Jackson demanded the Farmers remove the pipeline and sought a mandatory injunction. The Farmers filed a counterclaim, seeking, among other items, a permanent injunction that would prohibit Jackson from interfering with their use of free gas. Jackson argued that the right to free gas only extended if a principal dwelling was present when the lease was executed in 1953. The district court agreed with the Farmers and granted their injunctive relief.

In deciding this case, the Supreme Court first adopted the district court's reasoning in defining "'principal dwelling house.'" The court agreed with the district court that the "'"principal dwelling house" . . . is not limited to mean a building in existence at the time the lease is written . . . . Where no structure exists at the date of the lease, the only meaning which could be ascribed to the term would be a dwelling subsequently to be erected.'" 225 Kan. at 735-36. The *Jackson* court ruled: "The only dwelling house on land included in an oil and gas lease in the 'principal dwelling house' within the meaning and

14

intent of the lease, even though the house was erected long after the lease was executed." 225 Kan. 732, Syl. ¶ 1.

For heating the principal dwelling, the *Jackson* court explained, the right to take gas free of charge is a covenant running with the surface of the land. 225 Kan. 732, Syl. ¶ 3. Further, "free gas may be transferred from one dwelling house to another so long as the use is limited to the one principal dwelling house." 225 Kan. at 736 (citing *Salisbury v. Columbian Fuel Corporation*, 387 S.W.2d 864 [Ky. 1965], which "held that the right to use free gas was a covenant running with the land"). Consequently, through their deed to the surface, the Farmers acquired this right of free gas. 225 Kan. at 738. The *Jackson* court held that because the Farmers' home was the only dwelling on their tract, it was the principal dwelling and was therefore entitled to free gas. 225 Kan. at 738.

*Farmer* instructs us that the right to free gas is a covenant running with the land, not a "first-in-line first-in-right," as the Smootses claim. Here, at the time of the Hills' request for free gas, their property contained the only principal dwelling. The Smootses' tract was vacant until September 2021, when they began construction on a residence. Consequently, as *Farmer* shows us, the right to free gas was thus transferred from the prior principal dwelling—the owners of the trailer—to the present principal dwelling—the Boese residence, which was formerly the Hills' residence. See 225 Kan. at 738.

In *Richardson*, the Kansas Supreme Court examined a gas lease containing the same free gas language as the 1950 lease in this case. In that case, there was no dwelling on the property at the time the lease was executed, though the landowners built a dwelling 10 years after execution. The subsequent landowners, Edward and Elizabeth Toothman, later subdivided the lease property into five tracts, keeping the tract with the original dwelling and selling the other four tracts.

15

Shortly thereafter, the owners of two other tracts—Donald and Roberta Toothman and the Richardsons—built dwellings. Mr. and Mrs. J.C. Harbord, who owned another tract, were the first to request free gas from the gas company, Northwest Central. Northwest Central granted their request for free gas. When the other owners made similar requests, Northwest Central denied the other owners' requests because it was already providing gas to the Harbords' tract. The other owners then sued to determine who was entitled to the free gas, theorizing that *all* owners were entitled to the free gas. The district court granted the other owners' motion for summary judgment.

On appeal, the *Richardson* court found that the lease was ambiguous as to the party entitled to free gas, concluding the lease "could require the lessor to provide free or cheap gas to any number of purchasers. However, it could also be interpreted to mean that only the owner of the principal dwelling house is entitled to free or cheap gas for domestic use." 241 Kan. at 758. The *Richardson* court reversed the district court's ruling and held that "while the covenant runs with the land, it obligates the lessee [Northwest Central Pipeline Corp.] to provide benefit for only one assignee of lessor. Thus, the present owner of lessor's principal dwelling is entitled to the cheap gas." 241 Kan. at 760.

The Smootses argue that *Richardson* is distinguishable, given that no one else in that case had used free gas. We disagree and find this case instructive. Given that the lease language in *Richardson* was the same as the lease in this case, *Richardson* establishes that the 1950 lease provided free gas to one dwelling on the property—even if the principal dwelling was not present when the lease was first enacted. More important, both *Richardson* and *Jackson* provide that, under these terms, the covenant runs with the land. Neither decision was based on the Smootses' "first-in-time first-in-right" argument.

Last, we find *Jacobs v. Dye Oil, LLC*, 147 N.E.3d 52 (Ohio Ct. App. 2019), beneficial in answering this question. There, the Jacobses owned part of the land covered by a gas lease granting free gas to one home on the property. Amid disputes over

16

expiration and breach of the lease, the Jacobses claimed in part that Dye Oil breached the lease by failing to provide them with free gas. The original residence that received free gas was demolished, leaving the Jacobses' residence the only one on the lease property.

The *Jacobs* court held that because the Jacobses owned the only residence on the property and the lease did not specify which house could receive free gas, the Jacobses had the right to free gas subject to the lease's requirement that the Jacobses provide certain administrative information to Dye Oil. That case is slightly different, however, in that the Jacobses had to also fulfill administrative requirements to receive the free gas. Because they failed on that front, the *Jacobs* court found Dye Oil did not breach the lease agreement by failing to provide the free gas. 147 N.E.3d at 71.

Similar to *Jacobs*, here, the trailer that previously used free gas was removed from the lease property. When the Smootses acquired their tract, there was no longer any dwelling on their property. Later, the only dwelling on the leased tracts for several years was owned by the Hills (later sold to Boese). Additionally, the lease did not refer to a specific dwelling that could receive free gas. It only stated the principal dwelling could receive free gas. Therefore, *Jacobs*, read together with *Richardson*'s interpretation of similar lease language that "the present owner of lessor's principal dwelling is entitled to the cheap gas," shows that Boese—as the owner of the only dwelling on the lease property—is the present owner of the principal dwelling. Under the lease, the Hills had the right to free gas in 1999, which remains with Boese, who purchased the tract from the Hills.

Here, the Rollinses were not the sole owners of the lease property when they conveyed their tract to the Smootses. Thus, the Smootses never obtained an exclusive right to the free gas under the lease. There was no specific conveyance of the free gas right to the Smootses or anyone else.

17

We note that the Smootses rely on several cases from other states in support of their "first-in-time first-in-right" claim. Yet from our review of these cases, we do not find support for their position and find them distinguishable.

We conclude that the district court correctly determined Southern Star properly provided free gas to Boese, owner of the principal dwelling. We affirm the district court's ruling granting summary judgment to Southern Star.

Affirmed.